## NEBRASKA *v.* WYOMING ET AL.

No. 108, Orig.   Argued January 13, 1993—Decided April 20, 1993

O'CONNOR, J., delivered the opinion for a unanimous Court.

*Dennis C. Cook*, Senior Assistant Attorney General, argued the cause for defendant State of Wyoming. With him on the briefs were *Joseph B. Meyer*, Attorney General, and *Raphael J. Moses, Charles N. Woodruff*, and *James R. Montgomery*, Special Assistant Attorneys General. *Gale A. Norton*, Attorney General, argued the cause for defendant State of Colorado. With her on the brief were *Raymond T. Slaughter*, Chief Deputy Attorney General, *Timothy*

*M. Tymkovich,* Solicitor General, and *Wendy C. Weiss,* First Assistant Attorney General.

*Richard A. Simms,* Special Assistant Attorney General, argued the cause for plaintiff State of Nebraska. With him on the briefs were *Don Stenberg,* Attorney General, *Marie C. Pawol,* Assistant Attorney General, *James C. Brockmann,* and *Jay F. Stein.*

*Jeffrey P. Minear* argued the cause for the United States. With him on the brief were *Solicitor General Starr, Acting Assistant Attorney General O'Meara, Edwin S. Kneedler, Andrew F. Walch,* and *Patricia L. Weiss.**

JUSTICE O'CONNOR delivered the opinion of the Court.

In this original action we revisit the dispute among Nebraska, Wyoming, Colorado, and the United States over water rights to the North Platte River. In 1945, this Court entered a decree establishing interstate priorities on the North Platte and apportioning the natural flow of one critical portion of the river during the irrigation season. Nebraska returned to the Court in 1986 seeking an order for enforcement of the decree and injunctive relief. A Special Master, appointed by the Court, has supervised pretrial proceedings and discovery since 1987. Before us now are the Special Master's recommended dispositions of several summary judgment motions, together with exceptions filed to the Special Master's reports.

I

The North Platte River rises in northern Colorado and flows through Wyoming into Nebraska, where it joins the South Platte River. The topology of the river and the history of its early development are described at length in the Court's 1945 opinion. See *Nebraska* v. *Wyoming,* 325 U. S.

---

*Briefs of *amici curiae* were filed for the Basin Electric Power Cooperative by *Edward Weinberg, Richmond F. Allan, Michael J. Hinman,* and *Claire Olson;* and for the National Audubon Society et al. by *Peter A. A. Berle* and *Abbe David Lowell.*

589, 592–599. In 1934, Nebraska, invoking this Court's original jurisdiction under Article III, § 2, of the Constitution, brought an action against Wyoming seeking an equitable apportionment of the North Platte. Colorado was impleaded as a defendant, and the United States intervened. After 11 years of litigation, the Court imposed restrictions on storage and diversion by the upstream States, 325 U. S., at 621–625, established priorities among federal storage reservoirs and certain canals, *id.*, at 625–637, and apportioned the so-called "pivotal" reach of the North Platte between Whalen, Wyoming, and the Tri-State Dam. The natural irrigation-season flows in that section of the river were apportioned 75% to Nebraska and 25% to Wyoming. *Id.*, at 637–654.

The Court directed the parties to formulate a decree to implement its decision. See *id.*, at 657. The resulting decree included a "reopener" provision, Paragraph XIII, that states, in relevant part:

> "Any of the parties may apply at the foot of this decree for its amendment or for further relief. The Court retains jurisdiction of this suit for the purpose of any order, direction, or modification of the decree, or any supplementary decree, that may at any time be deemed proper in relation to the subject matter in controversy. Matters with reference to which further relief may hereafter be sought shall include, but shall not be limited to, the following:
>
> . . . . .
>
> "(c) The question of the effect of the construction or threatened construction of storage capacity not now existing on tributaries entering the North Platte River between Pathfinder Reservoir and Guernsey Reservoir;
>
> . . . . .
>
> "(f) Any change in conditions making modification of the decree or the granting of further relief necessary or appropriate." *Id.*, at 671–672.

Paragraph XIII reflects the Court's observation that the decree is designed to "deal with conditions as they obtain today" and that it "can be adjusted to meet . . . new conditions." *Id.*, at 620. The Court noted in more than one place in its opinion the need to retain jurisdiction to modify the decree in light of substantial changes in supply, threatened future development, or circumvention of the decree. See, *e. g., id.*, at 622, 625, 628–629. Since it was entered, the decree already has been modified once, pursuant to the parties' stipulation, to account for construction of a new reservoir. See *Nebraska* v. *Wyoming*, 345 U. S. 981 (1953).

In 1986, Nebraska petitioned the Court for relief under Paragraph XIII. Nebraska alleged that Wyoming was violating or threatening to violate the decree by virtue of developments on two North Platte tributaries, Deer Creek and the Laramie River. Nebraska also objected to certain actions taken by Wyoming with respect to the Inland Lakes in Nebraska. We granted Nebraska leave to file the petition. Wyoming answered and counterclaimed, arguing, essentially, that Nebraska was circumventing the decree by demanding and diverting water from above the Tri-State Dam for uses below Tri-State that are not recognized in the decree.

After we referred the matter to Special Master Owen Olpin, Wyoming moved for summary judgment. In his First Interim Report, the Master explained his decision to deny the motion but leave open the possibility of summary adjudication following further factual findings. See First Interim Report (June 14, 1989). An intensive period of discovery followed. All four parties then moved for summary judgment on one or more issues. A year later, the Special Master filed a Second Interim Report. See Second Interim Report on Motions for Summary Judgment and Renewed Motions for Intervention (Apr. 9, 1992) (hereinafter Second Interim Report). The Master recommended that the Court deny the intervention motions of certain *amici*. No exceptions have been filed to this recommendation, and

we adopt it. The Master also recommended that the Court grant summary judgment to Nebraska and the United States on the Inland Lakes issue, grant partial summary judgment to Nebraska on a discrete question related to the below Tri-State issues, and deny summary judgment on the remaining issues. Exceptions have been filed by Nebraska, Wyoming, Colorado, and *amicus* Basin Electric Power Cooperative (Basin). The United States has filed a brief opposing the exceptions. We agree with the Master's recommended dispositions of the summary judgment motions and accordingly overrule the exceptions.

## II

At the outset we consider the legal principles governing the case. The parties do not challenge the summary judgment standards applied by the Special Master. The Master correctly observed that, although not strictly applicable, Rule 56(c) of the Federal Rules of Civil Procedure and our precedents construing that Rule serve as useful guides. See this Court's Rule 17.2. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. Rule Civ. Proc. 56(c). When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to "make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex Corp.* v. *Catrett,* 477 U. S. 317, 322 (1986). In determining whether a material factual dispute exists, the Court views the evidence through the prism of the controlling legal standard. *Anderson* v. *Liberty Lobby, Inc.,* 477 U. S. 242, 248 (1986).

The disagreement in this case centers on the applicable legal standards. The question is whether these proceedings involve an application for *enforcement* of rights already recognized in the decree, or whether Nebraska seeks a *modification* of the decree. According to Wyoming, although the Court has jurisdiction to modify the decree under Paragraph

XIII, Nebraska obtained leave to file its petition on the assurance that the case would involve only enforcement of existing rights. In Wyoming's view, Nebraska subsequently, and improperly, transformed the case into a request for recognition of new rights—in essence, into a request for another equitable apportionment. If Nebraska is allowed to argue for modification of the decree, Wyoming and *amicus* Basin maintain, the same high evidentiary threshold applicable to claims for new apportionments applies. Under that standard, Nebraska can prevail only upon proof "by clear and convincing evidence" of "some real and substantial injury or damage." *Idaho ex rel. Evans* v. *Oregon,* 462 U. S. 1017, 1027 (1983). Accord, *Colorado* v. *Kansas,* 320 U. S. 383, 393 (1943); *Connecticut* v. *Massachusetts,* 282 U. S. 660, 669 (1931).

We do not read the pleadings as narrowly as does Wyoming. Nebraska's petition and supporting briefs do contain ambiguous language. See, *e. g.,* Petition for an Order Enforcing Decree and for Injunctive Relief 2 (Oct. 6, 1986) (hereinafter Petition) (alleging that Wyoming's actions violate the apportionment already "established in the Decree"); Reply to Wyoming's Brief in Opposition to Motion for Leave to File Petition 2 (Jan. 14, 1987) ("We do not propose to litigate anything new, but simply to protect what the Court has already decided"). But Nebraska also expressly invoked Paragraph XIII, and particularly subparagraphs (c) and (f). See Petition 3. As we have said, the Court in those sections retained jurisdiction to modify the decree to answer unresolved questions and to accommodate "change[s] in conditions"—a phrase sufficiently broad to encompass not only changes in water supply, see, *e. g., Nebraska* v. *Wyoming,* 325 U. S., at 620, but also new development that threatens a party's interests. Furthermore, nothing would prevent Nebraska from submitting a new petition if we deemed the original one deficient. We therefore decline the invitation, at this late date, to restrict the scope of the litigation

solely to enforcement of rights determined in the prior proceedings.

At the same time, we find merit in Wyoming's contention that, to the extent Nebraska seeks modification of the decree rather than enforcement, a higher standard of proof applies. The two types of proceeding are markedly different. In an enforcement action, the plaintiff need not show injury. See, *e. g.*, *Wyoming* v. *Colorado*, 309 U. S. 572, 581 (1940). When the alleged conduct is admitted, the only question is whether that conduct violates a right established by the decree. To be sure, the right need not be stated explicitly in the decree. As the Master recognized, when the decree is silent or unclear, it is appropriate to consider the underlying opinion, the Master's Report, and the record in the prior proceedings to determine whether the Court previously resolved the issue. See, *e. g.*, *Wyoming* v. *Colorado*, 286 U. S. 494, 506–508 (1932). The parties' course of conduct under the decree also may be relevant. But the underlying issue primarily remains one of interpretation. In a modification proceeding, by contrast, there is by definition no pre-existing right to interpret or enforce. At least where the case concerns the impact of new development, the inquiry may well entail the same sort of balancing of equities that occurs in an initial proceeding to establish an equitable apportionment. See *Nebraska* v. *Wyoming, supra,* at 618 (listing equitable considerations).

As discussed below, we believe that the Inland Lakes question is fairly characterized as an enforcement issue. The claims regarding tributary development, however, raise questions not decided in the original proceedings and therefore may be best understood as requests for modification of the decree. The question remains what evidentiary standard applies to such claims. The Master evidently thought the high standard advocated by Wyoming inapplicable because this is not a case in which the Court is asked to inter-

fere with state sovereign interests "in the first instance."
Second Interim Report 13.

We disagree with the Master to this extent. Paragraph
XIII perhaps eases a plaintiff's burden of establishing, as an
initial matter, that a claim falling within its purview is "of
that character and dignity which makes the controversy a
justiciable one under our original jurisdiction." *Nebraska* v.
*Wyoming*, 325 U. S., at 610. After all, a variety of changed
conditions may "promis[e] to disturb the delicate balance of
the river" created by the decree. *Id.*, at 625. But when
the plaintiff essentially seeks a reweighing of equities and
an injunction declaring new rights and responsibilities, we
think the plaintiff still must make a showing of substantial
injury to be entitled to relief. That is so not only because a
new injunction would work a new infringement on sovereign
prerogatives, but also because the interests of certainty and
stability counsel strongly against reopening an apportion-
ment of interstate water rights absent considerable justifi-
cation. Cf. *Arizona* v. *California*, 460 U. S. 605, 615–628
(1983).

### III

With these principles in mind, we turn to the summary
judgment motions. To the extent that we agree with the
Master, we have found it unnecessary to repeat in detail his
careful evaluation of the voluminous evidence.

### A

The Inland Lakes are four off-channel reservoirs in Ne-
braska served by the Interstate Canal, which diverts from
the North Platte at Whalen, Wyoming. Both the Inland
Lakes and the Interstate Canal are part of the North Platte
Project, a series of reservoirs and canals operated by the
United States Bureau of Reclamation (Bureau). Since 1913,
the Bureau has diverted water through the Interstate Canal
for storage in the Inland Lakes during nonirrigation months

for release to Nebraska users during the irrigation season. Due to icing conditions on the Interstate Canal during the winter, the Bureau also temporarily has stored water destined for the Inland Lakes in the Guernsey and Glendo Reservoirs.

It appears that the Inland Lakes always have been operated with the December 6, 1904, priority date that Wyoming recognizes for other original components of the North Platte Project, even though the Bureau never obtained a separate Wyoming storage permit for the Inland Lakes. In 1986, however, Wyoming sued the Bureau in Wyoming state court, seeking to enjoin the Bureau from storing water in the Inland Lakes without a state permit and out of priority with other Wyoming users. (The action was subsequently removed to Federal District Court and dismissed without prejudice.) As the Master indicated, there is some reason to think that Wyoming wished to establish a post-1986 priority date for the Inland Lakes in order to increase the amount of North Platte water available for the new project on Deer Creek. At any rate, Nebraska (which was not a party to the Wyoming lawsuit) challenged Wyoming's actions in its petition to this Court.

Nebraska and the United States moved for summary judgment, seeking determinations that the decree entitles the Bureau to continue its longstanding diversion and storage practices and that the Inland Lakes have a·priority date of December 6, 1904. Wyoming moved for partial summary judgment that the Inland Lakes do not have storage rights under either state law or the decree. The Special Master recommended that we grant the motions of Nebraska and the United States and deny Wyoming's motion. That the Bureau lacks a separate Wyoming permit for the Inland Lakes, he reasoned, is immaterial because the question of the Inland Lakes' priority was determined in the original proceedings. The decree did not explicitly establish the Inland Lakes' priority. But it is undisputed that the Court

recognized a right to store 46,000 acre-feet of water in the Inland Lakes and, at Wyoming's suggestion, counted that amount to reduce Nebraska's requirement of natural flows in the pivotal reach. See Report of Michael J. Doherty, Special Master in *Nebraska* v. *Wyoming*, O. T. 1944, No. 4, pp. 60–61 (hereinafter Doherty Report); 325 U. S., at 646, 649, and n. 2. The Master therefore concluded that the Inland Lakes' priority was a necessary predicate of the apportionment and should not be disturbed. He also suggested that Wyoming's postdecree acquiescence in the Bureau's administration of the Inland Lakes should prevent Wyoming from challenging the 1904 priority date now.

We think the evidence from the prior litigation supports the conclusion that the Inland Lakes' priority was settled there. And even if the issue was not previously determined, we would agree with the Special Master that Wyoming's arguments are foreclosed by its postdecree acquiescence. Cf. *Ohio* v. *Kentucky*, 410 U. S. 641, 648 (1973) ("[P]roceedings under this Court's original jurisdiction are basically equitable in nature, and a claim not technically precluded nonetheless may be foreclosed by acquiescence" (citation omitted)). Accordingly, we clarify today that the Inland Lakes share a December 6, 1904, priority date with other original components of the North Platte Project. Pursuant to that priority, the Bureau has a right to divert 46,000 acre-feet of water during the nonirrigation season months of October, November, and April for storage in the Inland Lakes. Although the practice of storing Inland Lakes water temporarily in the Guernsey and Glendo Reservoirs was not established in 1945, the United States contends, and Wyoming apparently does not dispute, that the practice is necessary to ensure the delivery of the 46,000 acre-feet of water envisioned in the apportionment. For that reason we hold that the temporary storage practice also is protected. Our conclusion does not otherwise affect the rights of the Guernsey and Glendo Reservoirs under the decree.

## B

The Laramie River originates in Colorado and meets the North Platte in Wyoming in the pivotal reach. In its petition, Nebraska challenged two new developments on the Laramie near the North Platte confluence. The first, Grayrocks Project, was completed in 1980. Operated by *amicus* Basin, it consists of Grayrocks Reservoir and an electric power generating plant. The second, Corn Creek Project, is a proposed irrigation system for Wyoming farmland.

Wyoming and Nebraska both moved for summary judgment, taking diametrically opposed positions with respect to their rights to Laramie waters. Nebraska claimed that the equitable apportionment of the water in the pivotal reach includes Laramie flows that historically have reached the North Platte. Wyoming contended that the waters of the Laramie are completely apportioned between Colorado and Wyoming by virtue of this Court's 1922 Laramie River decree, *Wyoming* v. *Colorado,* 259 U. S. 419, 496, modified, 260 U. S. 1, vacated and new decree entered, 353 U. S. 953 (1957), which the North Platte decree expressly left undisturbed.

Paragraph XII(d) of the North Platte decree does state that the decree "shall not affect . . . [t]he apportionment heretofore made by this Court between the States of Wyoming and Colorado of the waters of the Laramie River." 325 U. S., at 671; see also *id.,* at 592, n. 1 (Laramie decree "in no way affected" by North Platte decree). But we think the Master correctly concluded that Wyoming was not granted the right entirely to dewater the Laramie. The 1922 Laramie decree to which Paragraph XII(d) refers did not apportion *all* the waters of the Laramie; it dealt only with flows down to and including the Wheatland Project, a facility upstream of Grayrocks and Corn Creek. See *Wyoming* v. *Colorado,* 259 U. S., at 488.

There is a statement arguably to the contrary in a subsequent decision interpreting the 1922 decree. See *Wyoming* v. *Colorado,* 298 U. S. 573, 578 (1936) (decree establishes

Wyoming's right "to receive and divert . . . the remaining waters of the stream and its tributaries"). But we read that language to refer only to the waters actually apportioned in the earlier proceedings—that is, the waters down to and including Wheatland. There is also contrary language in the new Laramie decree entered on the joint motion of Wyoming and Colorado in 1957. See *Wyoming* v. *Colorado*, 353 U. S., at 953 (Wyoming "shall have the right to divert and use all water flowing and remaining in the Laramie river and its tributaries"). But the 1957 decree, entered without Nebraska's participation, cannot affect our interpretation of the 1945 North Platte decree, since Paragraph XII(d) addresses only the Laramie apportionment "heretofore made"—in other words, the 1922 decree.

Further, the Court apparently expected that some Laramie water would contribute to the natural flows available for apportionment in the pivotal reach. See, *e. g.*, Doherty Report 67, Table III (including Laramie inflows in calculation of natural flow in pivotal reach). But the Court did not affirmatively apportion Laramie flows to Nebraska, either. The decree did not restrict Wyoming's use of the Laramie or require Wyoming regularly to deliver a specified amount of Laramie water to the North Platte confluence. Since 1945, Laramie flows that actually have reached the North Platte have been included in the equitable apportionment, but neither Nebraska nor the United States has requested that Wyoming account for diversions above the confluence. For these and other reasons given by the Special Master, we agree that the evidence, most fairly read, indicates that the Court did not decide the fate of the excess Laramie waters in 1945.

Because the North Platte decree gives Nebraska no rights to Laramie waters, affording Nebraska injunctive relief would constitute a modification of the decree. We turn, then, to the question of injury. In 1978, Nebraska entered into a settlement agreement with Basin and other parties

(but not Wyoming) that limits Grayrocks' consumption of water and requires Basin to release certain minimum flows. The agreement also provides for further depletions in the event that Corn Creek is constructed. See Wyoming's App. to Brief in Opposition A–24 to A–32. At this juncture, Nebraska's argument seems to be that it will be injured if Wyoming interferes with Basin's mandatory minimum releases by allowing new Wyoming appropriators to divert from the Laramie between Grayrocks and the North Platte confluence.

Although Wyoming has declined to assure the Special Master that it will support Basin's obligation to maintain the minimum flows, see Second Interim Report 66–68, it is undisputed that Wyoming is not currently interfering with those flows. Other than Corn Creek, Nebraska points to no proposed development that might deplete releases from Grayrocks. Nor does Nebraska seem to argue that Grayrocks otherwise threatens its interests. The Master recommends that Paragraph XIII of the decree be amended expressly to indicate that Nebraska or the United States may apply for relief if Wyoming, in the future, threatens to interfere with the releases provided for in the settlement agreement. Because we do not believe such an amendment would add to our authority under subparagraph (f), we do not adopt this proposal. The Master also proposes to hold a status conference concerning Corn Creek. We have no objection to such a conference. We emphasize, however, that unless Nebraska comes forward with evidence sufficient to establish that Corn Creek (or some other project on the Laramie) poses a threat of injury serious enough to warrant modification of the decree, summary judgment should be entered in favor of Wyoming. We express no view as to whether, upon a proper showing of injury, incorporation of the settlement agreement into the North Platte decree would be appropriate.

## C

Deer Creek enters the mainstem of the North Platte in Wyoming between the Pathfinder and Guernsey Reservoirs, upstream of the pivotal reach. Nebraska's petition challenged Wyoming's proposed construction of a new storage reservoir on Deer Creek. As we have said, in Paragraph XIII(c) of the decree the Court expressly retained jurisdiction to consider requests for further relief with respect to the effect of threatened construction of new storage capacity on tributaries entering the North Platte between Pathfinder and Guernsey. See 325 U. S., at 671.

Wyoming moved for summary judgment on alternative grounds. It asserted that the primary function of the Deer Creek Project will be to furnish municipal water supplies (by exchange) to Wyoming communities. Accordingly, Wyoming claimed that, Paragraph XIII(c) notwithstanding, the project is exempt from challenge by virtue of Paragraph X of the decree, which provides:

> "This decree shall not affect or restrict the use or diversion of water from the North Platte River and its tributaries in Colorado or Wyoming for ordinary and usual domestic, municipal and stock watering purposes and consumption." *Id.*, at 670.

Wyoming also contended that Nebraska had failed to make an adequate showing of injury.

Although admitting that Paragraph X "poses some mysteries," Second Interim Report 79, the Special Master evidently agreed with Wyoming that the plain language of that provision permits Wyoming freely to divert North Platte water for ordinary and usual municipal uses and that the other provisions of the decree act only upon the water remaining after such diversions. The Master declined to recommend summary judgment on this ground, however, due to factual questions concerning the Deer Creek Project's municipal character. The Master also recommended against

summary judgment on the injury issue, based on an affidavit by H. Lee Becker, former state hydrologist for Nebraska. See Affidavit of H. Lee Becker ¶ 2 (Apr. 25, 1991) (stating that the project would cause reductions in the average year-end carryover storage of federal reservoirs on the North Platte and that "[s]uch reductions . . . could limit diversions in the [pivotal] reach in a series of dry years"), attached to Nebraska's Response to Wyoming's and Colorado's Motions for Summary Judgment and to Basin Electric's Memorandum in Support Thereof (Apr. 25, 1991).

Nebraska objects strenuously to the Master's interpretation of Paragraph X. The United States has not filed exceptions but agrees that the Master's interpretation is "problematic." Brief for United States Opposing Exceptions 35 (Aug. 17, 1992) (hereinafter U. S. Brief). We, too, are troubled by Paragraph X. As the Master pointed out, the parties to the original proceedings fought mightily over small quantities of water. It is therefore unclear why they and the Court would have meant that the upstream States could make municipal diversions of any magnitude, in derogation of the careful system of interstate priorities established under the decree, without the opportunity for further review.

We nonetheless think it unnecessary to settle upon a definitive interpretation of Paragraph X at this time. The Special Master rightly observed that the Deer Creek Project may not qualify as an ordinary and usual municipal use. Although Wyoming recently has promised to operate the project solely for municipal purposes, both the Final Environmental Impact Statement prepared for the project—which describes a plan of operation that the project may be obliged to follow—and the state permit identify nonmunicipal uses. Nebraska also has presented evidence that the communities that the Deer Creek Project is to serve do not need additional municipal supplies, and that, even if they did, there are more cost-effective alternatives than the proposed reservoir.

In addition, Nebraska may be unable to prove that operation of the Deer Creek Project will cause it substantial injury. Such proof is necessary, as we have indicated, because the decree does not currently restrict Wyoming's use of Deer Creek, and a new injunction would constitute a modification of the decree. Whether the project will injure Nebraska may depend on the way it is administered.

Wyoming has conceded that the Deer Creek Project will be operated in accordance with state law and in priority with the Glendo and Guernsey Reservoirs. It has not agreed, however, to operate the project junior to the Inland Lakes, perhaps because its position throughout the litigation has been that the Inland Lakes lack a priority date. In light of our recognition today that the decree establishes a 1904 priority date for the Inland Lakes, it is unclear whether Wyoming will persist in seeking to operate the Deer Creek Project out of priority. If the project is operated junior to the Inland Lakes, the evidence of injury to Nebraska appears to be diminished. See Affidavit of H. Lee Becker ¶¶ 4–6 (Aug. 12, 1988) (demonstrating that anticipated reductions in federal reservoirs' carryover storage would be smaller if Inland Lakes' priority were recognized), attached to Nebraska's Response to Wyoming's Motion for Summary Judgment (Aug. 22, 1988); Affidavit of David G. Wilde ¶ 89(b) (Aug. 15, 1988) (stating that, although Deer Creek would "substantially impac[t]" federal projects during an extended dry period, impacts would be "minimized" if Deer Creek were administered junior to the Inland Lakes), attached to Response of United States to Wyoming's Motion for Summary Judgment (Aug. 23, 1988). But Wyoming still may assert that Paragraph X permits it to divert for municipal uses out of priority with the Inland Lakes. In that event, we think the Wilde and Becker affidavits raise a genuine issue of material fact sufficient to defeat Wyoming's summary judgment motion.

## D

In its counterclaim, Wyoming alleged that Nebraska was violating the decree by demanding natural flows and storage water from sources above the Tri-State Dam and diverting those waters to uses below Tri-State that are not recognized in the decree. Wyoming also alleged that Nebraska was improperly demanding North Platte flows for diversion by canals at and above Tri-State Dam in excess of the irrigation requirements of the Nebraska lands entitled to water under the decree. Increased diversions by the Nebraska canals above Tri-State evidently benefit users below Tri-State because they create increased return flows.

Neither Wyoming nor Nebraska sought summary judgment on Wyoming's counterclaim. Rather, both States and Colorado have sought a number of more limited rulings with respect to the below Tri-State issues. We agree with the Master that most of these claims are "'too theoretical and not sufficiently anchored to concrete pleadings or an adequately developed factual [r]ecord'" to be susceptible of summary resolution at this time. Second Interim Report 92 (quoting Post-Argument Comments of United States 6 (July 29, 1991)). We further agree that one issue is sufficiently crystallized to warrant partial summary judgment for Nebraska.

Nebraska requested a determination that the decree does not impose absolute ceilings on diversions by canals taking in the pivotal reach. As the Master explained, the irrigation requirements of the lands the canals serve were calculated in the prior proceedings. But the requirements were calculated for the purpose of determining the appropriate apportionment of the pivotal reach, not to impose a cap on the canals' total diversions, either individually or cumulatively. See Doherty Report 161 ("[T]he findings herein as to *requirements* cannot, I think, be deemed a limitation upon individual canals or groups, in actual administration, either as to natural flow or storage water, nor do I think any such limita-

tions can properly be imposed by the decree" (emphasis in original)). Paragraph V of the decree, which sets forth the apportionment, makes no mention of diversion ceilings and expressly states that Nebraska is free to allocate its share among its canals as it sees fit. See 325 U. S., at 667.

In Wyoming's view, Paragraph IV of the decree requires a different result. The Master properly rejected this argument. Paragraph IV establishes the priority of Nebraska canals diverting in the pivotal reach relative to federal projects in Wyoming. See id., at 666–667. We agree with the United States that, although Paragraph IV "limits the extent to which the Nebraska canals may stop federal reservoirs from storing water, [it] does not place any 'absolute ceilings' or other restrictions on the quantities of water those canals may actually divert." U. S. Brief 40, n. 21. Wyoming asks us to clarify that the federal reservoirs have no obligation to bypass natural flow to a senior Nebraska canal when the canal is making excessive calls for federal storage water. Because there is as yet inadequate factual development on the question whether Nebraska canals have in fact made excessive calls, we decline to do so.

## IV

For the foregoing reasons, all of the exceptions filed to the Special Master's reports are overruled. The summary judgment motions of Nebraska and the United States regarding the Inland Lakes' priority date are granted, as is Nebraska's partial summary judgment motion with respect to the issue of canal diversion limitations. All other summary judgment motions are denied.

*It is so ordered.*