**In re HIGH FRUCTOSE CORN SYRUP ANTITRUST LITIGATION.**

**MDL No. 1087.**
**Master File No. 95–1477.**

United States District Court,
C.D. Illinois.

May 13, 2003.

Brian Posewitz, Tonkon Torp, LLP, Portland, OR, for Plaintiff Gray & Co.

Mark W. Ryan, Richard J. Favretto, Mayer, Brown & Platt, Washington, D.C., for Defendant Cargill, Inc.

Aubrey M. Daniel, III, Steven R. Kuney, Williams & Connolly, Washington, D.C., for Defendant Archer Daniels Midland Co.

Terry M. Grimm, Joseph Spiegler, Winston & Strawn, Chicago, IL, for Defendant A.E. Staley Manufacturing Co.

Donald R. Harris, Edward F. Malone, Jenner & Block, LLC, Chicago, IL, for Defendant American Maize–Products Co.

### ORDER

MIHM, District Judge.

This matter is now before the Court on various motions for summary judgment by Defendants. For the reasons set forth below, Cargill's Motion for Summary Judgment [# 193] is DENIED; A.E. Staley's ("Staley") Motion for Summary Judgment [# 196] is DENIED; American Maize/Cerestar USA Inc.'s Motion for Summary Judgment [# 192] is DENIED; and Archer Daniels Midland's ("ADM") Motion for Summary Judgment [# 191] is DENIED.

### BACKGROUND

#### I. The Parties

Plaintiff, Gray & Co. ("Gray") is an Oregon corporation that manufactures maraschino cherries, glazed fruits, and chocolate covered cherries. It has plants in Oregon and Michigan. During the relevant time period, the major manufacturers of corn syrup were ADM, Cargill, Staley, American Maize, CPC International, Minnesota Corn Processors ("MCP"), and Hubinger (later acquired by Roquette America). Cargill was the largest producer of corn syrup, with approximately double the capacity of the next largest competitor. Staley, ADM, and CPC had approximately equal shares of the market, with American Maize having the next largest capacity share. Together, the top four producers of corn syrup accounted for approximately 75% of total finishing capacity in the market. From 1989 to 1995, Gray purchased approximately $19 million worth of corn syrup directly from the Defendants to use as ingredients in its food products.

Gray brought suit against the seven major manufactures of corn syrup, as well as Golden Technologies, in federal district court in Oregon, alleging price fixing conspiracies in both the corn syrup and high fructose corn syrup markets. Gray has since settled with CPC, MPC, Hubinger, and Golden Technologies. ADM, Cargill, Staley, and American Maize will hereinafter be referred to as "Defendants".

#### II. The Product and Process

Corn syrup is a sweetener produced from corn that was historically substituted for sugar and is sometimes referred to as "glucose" or "glucose corn syrup". However, corn syrup is not as sweet as sugar and is used primarily to give body and consistency to the various products in which it is used. In the initial milling process, corn is separated into "starch slurry" and corn co-products, which include corn gluten feed, corn gluten meal, and corn oil. Starch slurry can then be used to make a variety of products including high fructose corn syrup ("HFCS"), ethanol, dextrose, crystalline fructose, potable alcohol, industrial starch, and corn syrup.

Although corn syrup and HFCS are both produced from corn in wet milling plants, they are quite different products. Corn syrup does not contain fructose and is less sweet than HFCS. There is very little substitutability between corn syrup and HFCS, and the end uses for corn syrup differ from the end uses for HFCS. For example, while some products use both corn syrup and HFCS, HFCS is generally used in soft drinks, while corn syrup is used in glazes, brewing, cannings, confectionary products, baked goods, and the dairy industry.

Most large corn wet millers produce at least seven or eight different grades of corn syrup, each grade having a different level of sweetness, maltose content, sodium content, and other characteristics. Within each grade, the corn syrup may have dif-

ferent chemical properties depending on whether the producer uses an acid-enzyme or carbon-based refining process. While there may be specific issues of substitutability in some cases, by and large, corn syrup is a homogeneous, commodity-type product.

### III. *The Industry*

During the relevant time, the sellers of corn syrup and HFCS were essentially the same few companies. With the exception of Golden Technologies, all of the sellers of HFCS also sold corn syrup. Both products were marketed and sold together under the general category of corn sweeteners. The same people who set prices for HFCS also set the prices for corn syrup and the process was generally the same. ADM's Terrance Wilson, who was convicted of fixing prices of lysine from 1992 to 1995, assumed control of pricing for corn syrup at the same time that he assumed control of pricing for HFCS. Moreover, the same people who marketed and sold HFCS also marketed and sold corn syrup.

Each of the Defendants was a member of the Corn Refiners Association ("CRA"), a trade association for members of the corn refining industry, and had been a member prior to 1988. The CRA stems from a predecessor organization that was founded in 1913 and has a professional staff of nine persons, including a President, a Vice President, and directors of congressional affairs, communications, and technical affairs. The CRA's activities are conducted through a Board of Directors and several committees. Between 1988 and 1995, the members of the CRA sent their monthly grind and shipment figures for corn syrup and other products (such as HFCS, starch, and dextrose) to the accounting firm of Ernst & Young ("E & Y"), which was retained by the CRA to gather members' statistical data. E & Y combined the individual producers' data and transmitted only the aggregate numbers to the individual producers. Only the independent accountants at E & Y saw individual company data; none of the CRA staff or representatives of the corn refiner members saw individual company data. Monthly shipment information was then provided by the CRA to the U.S. Department of Agriculture and the Federal Reserve.

During the relevant time, sellers issued price announcements only for "base grade" corn syrup. Base grade corn syrup had a dextrose equivalent of approximately 42 and a baume' of approximately 43.[1] Variations from base grade wee the same price as base grade or were priced by adding standard "product premiums" that were the same for all sellers. Product premiums were not negotiated. Buyers and sellers negotiated the price of base grade corn syrup and assumed standard product premiums, or sellers ensured that the difference in price between different grades was equal to the product premium. However, Defendants' internal business plans did not treat the different grades of corn syrup as separate products.

Finally, unlike the HFCS market, where there were two large buyers who could exert their buying power and complicate a price fixing agreement, there were no such power buyers in the corn syrup market. Rather, buying power was relatively well disbursed.

### IV. *The Alleged Conspiracy*

In 1992, the Federal Bureau of Investigations ("FBI") began an undercover investigation of price fixing at ADM with the

---

**1.** The dextrose equivalent is a measure of sweetness, while baume' is a measure of viscosity.

aid of Mark Whitacre ("Whitacre"), who was at that time the president of ADM's bioproducts division. Over the next two and a half years, Whitacre secretly made between 120 and 130 tapes of conversations and meetings in the lysine industry.[2] The investigation culminated in an FBI raid on ADM's headquarters in June 1995. As a result of the investigation, ADM pled guilty to price fixing in the lysine industry, as well as the citric acid industry, and paid $100,000,000.00 in criminal fines; civil cases followed closely on the heels of the criminal proceedings. Additionally, three ADM executives, including Whitacre, were criminally prosecuted and convicted. With the exception of ADM, none of the other Defendants involved in this case were implicated in either the lysine or citric acid conspiracies, and no indictments were returned with respect to HFCS.[3] The Department of Justice did not conduct any investigation of the market for regular corn syrup.

On December 17, 1997, Roquette Freres, the parent company of Roquette America, pled guilty to criminal charges of price fixing in the sodium gluconate market. Stephen Foster, Roquette America's vice president of sales and marketing, who had authority for pricing in the sodium gluconate market, also had authority for pricing corn syrup. ADM was named as a defendant along with Roquette in civil litigation regarding sodium gluconate.

Gray contends that beginning as early as 1989, Defendants, through their senior executives responsible for corn wet milling products, conspired to unlawfully fix prices in the not only the HFCS market, but also the corn syrup industry in violation of § 1 of the Sherman Act. Like the conspiracies identified by the Department of Justice in the lysine and citric acid markets, the corn syrup conspiracy was allegedly accomplished by these executives dictating prices to be quoted and charged to purchasers, limiting knowledge to a centralized core group of executives, negotiating inter-company purchases among themselves when required to balance volume discrepancies, attending CRA meetings to facilitate and conceal communications in furtherance of the conspiracy, and using the CRA to transmit information among the co-conspirators. Gray also points to the fact that ADM owned 32% of American Maize's Class A stock and 27% of all outstanding shares, as well as the fact that it was the largest shareholder in Tate & Lyle, PLC, the parent company of Staley since 1988, as circumstances that promoted and furthered the conspiracy. Throughout the conspiracy period, Gray argues that Defendants market shares were essentially stable, and substantial barriers prohibited other competitors from entering the corn syrup market.

Gray then identifies certain pricing practices as circumstantial evidence of conspiratorial activity. Price announcements generally followed within a few weeks of the CRA meetings, which Gray suggests were used as a cover for Defendants' secret price fixing conferences. Defendants also appear to have followed each others' lead with respect to corn syrup pricing by offering similar list prices and utilizing the same pricing mechanisms, which shifted uniformly from time to time. Additionally, on several occasions, one or more of the Defendants refused to take advantage of

---

**2.** Lysine is an amino acid used to stimulate an animal's growth that can be added to animal feed during the manufacturing process.

**3.** Although Cargill was initially named as a defendant in the citric acid conspiracy, summary judgment was entered in its favor on January 23, 1998. *In re Citric Acid Litigation,* 996 F.Supp. 951, 961 (N.D.Cal.1998), *aff'd,* 191 F.3d 1090 (9th Cir.1999).

opportunities to acquire the customer of another Defendant.

### V. *This Litigation*

This action was originally filed in the United States District Court for the District of Oregon. Although Gray opted out of the consolidated class proceedings, it was subsequently transferred to this Court by the Judicial Panel on Multi–District Litigation as a tag-along case for purposes of consolidated pretrial proceedings with the class action. The case has been pending here for more than five years, largely due to the complexity and extensive amount of discovery involved, as well as two interlocutory appeals and the appeal to the Seventh Circuit following the Court's ruling on the motions for summary judgment in the class case.

It was previously agreed by all parties that the rulings on the motions for summary judgment in the HFCS class action claim would govern Gray's HFCS claim as well, and that portion of Gray's case awaits remand and jury trial following the resolution of the present motion addressing Gray's corn syrup claim. The Defendants have now moved for summary judgment on that claim. Plaintiffs have filed their response, and this Order follows.

### LEGAL STANDARD

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 2553. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex Corp.,* 106 S.Ct. at 2553. This Court must then determine whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson,* 106 S.Ct. at 2511.

"In determining whether a material factual dispute exists, the court views the evidence through the prism of the controlling legal standard." *Nebraska v. Wyoming,* 507 U.S. 584, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). Here, that means the evidence must be viewed through the prism of antitrust law. Although some of the record may be discussed piecemeal, the Court is nevertheless mindful of its obligation to weigh the evidence as a whole in that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Company v. Union Carbide and Carbon Corporation,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

## DISCUSSION

■ Section 1 of the Sherman Act prohibits "conspiracy in restraint of trade or commerce." 15 U.S.C. § 1. A civil plaintiff asserting a Section 1 claim must establish: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Productions, Inc.*, 8 F.3d 1217, 1220 (7th Cir.1993).

■ Gray can establish a genuine issue of material fact by producing either direct evidence that Defendants conspired to fix prices in the corn syrup industry or circumstantial evidence from which a reasonable fact finder could concluded that Defendants conspired. Direct evidence in this context is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litigation*, 166 F.3d 112, 118 (3rd Cir.1999). There are no examples of direct evidence in this case, and Gray must therefore attempt to make a sufficient showing via circumstantial evidence.

Gray points to certain evidence of an explicit agreement to fix prices in the HFCS market discussed in the Seventh Circuit's opinion in *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651 (7th Cir.2002), as equally applicable to the corn syrup market based on the similarity of the market structures, actors involved, time frame, and mechanisms employed to implement the illegal agreement. Essentially, Gray argues that the corn syrup conspiracy was not entirely separate from the alleged HFCS conspiracy but rather the two markets were part of a larger conspiracy in the corn refining industry. While Defendants correctly note that the evidence does not specifically address corn syrup per se, that does not negate its possible relevance, as much of the evidence discussed and found to be probative by the Court of Appeals did not specifically address HFCS either. At this stage of the litigation, the Court cannot find that this evidence is irrelevant to Gray's allegations of price fixing in the corn syrup industry.

In this respect, Gray has identified the following evidence: (1) Staley's Summary Operating Plan for 1989–91 stating "[w]e will announce and support efforts to limit corn syrup ... pricing to a quarterly basis"; (2) ADM's president stated "our competitors are our friends. Our customers are the enemy"; (3) a director of Staley's parent company said "competitors['] happiness is at least as important as customers['] happiness"; (4) the comment by a Staley director that "every business I'm in is an organization"; (5) the statement by Michael Andreas that Cargill was ADM's "friendly competitor" and that there was an "understanding between the companies that ... causes us not to ... make irrational decisions"; (6) Michael Andreas' comparison of ADM and Cargill to Mitsubishi and Mitsui, Japanese conglomerates widely believed to fix prices and allocate markets; (7) a handwritten Cargill document with the heading "COMPETITORS" that stated "entry of new entrants (barriers) and will they play by the rules (discipline)"; (8) a comment by Terrance Wilson shortly after the FBI raid on ADM that he did not know "what other companies [the FBI] hit ... I don't know ... if they hit Staley or not"; (9) ADM had a direct ownership interest in American Maize and an indirect ownership interest in, as well as two joint ventures with, Staley; and (10) a statement by one of Staley's plant managers that "[w]e have an understanding within the industry not to undercut each other's prices."

In attempting to meet its burden of proof, Gray further relies on other conduct and economic evidence of record, as well as

the inferences that Gray suggests can reasonably be drawn therefrom. Until late 1994, all sellers of corn syrup announced prices on an FOB basis. When calculating delivery costs, ADM and Staley routinely announced FOB prices for locations where Cargill had plants, namely Dayton, Ohio, and Memphis, Tennessee. As a result, Defendants could easily determine the portion of a competitor's price attributable to transportation costs to derive the competitor's effective base price. Beginning with 1995 pricing, all sellers announced corn syrup prices on a delivered basis by zone.

Prior to 1989, buyers of corn syrup could get annual pricing despite announcements that annual pricing would not be offered. While sellers expressed a preference for quarterly pricing, annual pricing was nevertheless offered at a premium to compensate sellers for the risk that net corn costs might go up over the year. In late 1988, Defendants announced that they would not offer annual pricing and would instead offer only quarterly pricing at an increased rate from prior years. This time, Defendants adhered to their announced policy of quarterly pricing, and buyers of corn syrup were unable to obtain annual pricing. Along with quarterly pricing, Defendants began a uniform new practice of requiring buyers to commit to an annual volume by a specific deadline or be forced to purchase corn syrup on the spot market. Although Defendants asserted that quarterly pricing was necessary because of uncertainty in prices for corn and byproducts, sellers did not require quarterly pricing on products other than corn syrup and HFCS. Refusal of requests for annual pricing and the requirement of annual volume commitments for any forward pricing continued through 1993.

Between October 22, 1993 and November 3, 1993, each Defendant announced a return to annual pricing for both corn syrup and HFCS for the first time since 1987. There was a CRA meeting in Naples, Florida between November 3, 1993, and November 7, 1993. Within ten days of that meeting, each Defendant retracted its offer of annual pricing. They claimed that their retractions were due to a flood in 1993, yet the flooding was over by the fall of 1993, before the offers of annual pricing had been initially made. In 1994, Defendants all announced a unanimous return to annual pricing for corn syrup for 1995, with no offers of quarterly pricing as an alternative.

In 1989, a Staley salesman attributed his reduced sales to Staley's "lack of competitiveness." In the process of negotiating corn syrup and HFCS contracts for 1989 through 1991, a salesman from Staley told Gray that he could not quote a price on either product because his boss was at an industry meeting and pricing would not be determined until after his boss returned from the meeting. Salesmen began to announce that they were following the pricing or pricing program of another supplier, usually Cargill, and that they could not quote a price until Cargill announced its prices. In February 1990, an American Maize personnel review indicated that a salesman was "stymied by management decisions to [not] participate in opportunities b[r]ought forth by him." In September 1993, American Maize told its salesmen that it wanted to:

> [T]ry and impress upon all of us the importance of supporting our industry in strengthening pricing as we head for 1994 ... no matter who makes the first announcement, we fully intend to abide by that published announcement. We are at this time prepared to "bite the bullet" and suffer what—if any—losses may occur. Let me again make this perfectly clear—there will be no exceptions—and if you quote anything different, serious repercussions may happen. Remember—our company and our in-

dustry need strength put back into our pricing discipline and you are the front line to accomplish it.

Not only were prices announced at relatively the same time, they also followed the same format as either stated prices or a certain increase over previously announced prices. Moreover, when Cargill announced that it was switching from FOB to zone delivered prices, the other Defendants made the same announcement within days, and ADM and American Maize announced zone-delivered prices that were exactly the same as Cargill's.

There are also incidents that Gray contends are evidence of deliberately reduced competition. Roquette America supplied corn syrup to Gray in 1988 but then completely stopped calling on Gray. A 1989 memo from an ADM salesman states that he has "not been very aggressive" in pursuing the Gray account "because we did not want to mess with a Cargill account." From 1989 through 1995, MCP declined to supply corn syrup to Gray's Michigan plant, but MCP began supplying the plant in 1995, after the end of the alleged conspiracy. Kraft offered Staley more sweetener business as a reward for its agreement to supply starch, but Staley declined to accept the additional business. In November 1994, Cargill would not quote corn syrup and HFCS prices to Eastern Foods despite threats from Eastern Foods to switch its business to ADM; following this call, the Cargill representative made a note to "[r]emember ADM won't offer pricing until we do." In December 1994, MCP wouldn't give corn syrup prices to customers who split business with other suppliers until the end of the month, and ADM also held back quotes. At some times, ADM refused to makes sales to customers even at its own list price, and at other times, Wilson told his salesmen to quote prices that he knew would not get the business. At that time, all suppliers were standing together, with only one known exception to Cargill's zone pricing. There is greater evidence of more intercompany sales among the Defendants during the period of the alleged conspiracy. Although market shares were relatively stable in the years for which data is available, ADM's market share dropped from 1993 to 1994, which coincides with the time period when ADM was selling significant amounts of corn syrup to other manufacturers. Cargill bought virtually no corn syrup from other manufacturers outside the conspiracy period but purchased significant amounts from ADM and American Maize during that period. Similarly, Staley made no sales to other Defendants before the conspiracy period but made significant sales within that period, and American Maize made significant purchases from other Defendants within the conspiracy period despite having made no such purchases outside of that period. Gray also notes that the Defendants purchased corn syrup from other manufacturers even though they had excess capacity.

Defendants were all members of the CRA, and the CRA board met at least twice per year. Officials of the Defendant companies attended these meetings even though they were not the official representatives and had no official role in the association. On one of the DOJ tapes, Terrance Wilson explained how trade association meetings were used as a cover for price fixing meetings in the lysine industry. The Defendants reported sales volumes to the CRA every month, and Mark Whitacre referred to Wilson's experience in the CRA and other associations with reporting sales to ensure compliance with volume allocation agreements in another DOJ tape. On another DOJ tape, Wilson makes reference to "where we do it uh in one case" about how sales volumes are reported to the organization by the seventh working day of the month and are

used to track volume allocation; members of the CRA were to make preliminary shipment reports to the association auditors no later than the seventh working day of the month following the reporting month. Wilson also stated that "it's much easier to do corn wet milling because there's only ... I can guess what [another producer is] selling." On another tape, Wilson told another ADM executive that he knew "exactly what our prices are gonna be so I don't have to worry," and "I even know which customers to take," to which the executive replied that they were "tryin' to do this in the sweetener business."

An American Maize document reported that pricing was up $3 per cwt over the previous year, which was "a direct reflection of the discipline and strength our industry showed from mid-November onward in simply holding the line on any discounting, and although it hurt our effort here and there, the bulk of our normal accounts are still with us." Similarly, in a 1988–90 business plan, Staley indicated that its share of the corn syrup market was 16.9% and that it expected it to stay there, while the same document had noted Staley's aggressiveness in the market in 1987. Staley's 1990 strategic plan indicated an intent to pursue only "non-disruptive opportunities" and to maintain a 15% market share, as opposed to the 16.9% share predicted in 1988.

In 1996, after the end of the alleged conspiracy, corn syrup prices went down dramatically despite the fact that corn prices were going up. ADM and Staley began to discount aggressively. Although Gray had entered into forward contracts for all of 1996, Gray was able to obtain substantially lower prices on both corn syrup and HFCS. In fact, ADM offered Gray corn syrup at $13.40 per cwt even though it knew that Gray had already contracted for $15.00 per cwt; this represents a substantial discount. Other Defendants then followed suit even though Gray had already agreed to annually priced contracts with them. Prices remained so low in 1997 that some suppliers stopped selling corn syrup and HFCS because they couldn't sell it above their average cost.

In addition to this conduct evidence, Gray offers the expert testimony of Dr. John Connor regarding the structure of the corn syrup market. Dr. Connor opined:

> The major structural features of the corn syrup and high fructose corn syrup markets are eminently conducive to cartel behavior. These markets are highly concentrated on the sellers' side, produce homogenous products, and are protected from entry by production technology and the reputations of their incumbents. Buyer concentration is low in all by the high fructose corn syrup–55 market.

In Dr. Connor's opinion, at least nine identifiable shifts in pricing or output practices, combined with the structure of the corn syrup market, lead to the conclusion that the corn refiners more likely than not colluded to increase prices from 1989 through 1995. Gray also offers the regression analysis of economic expert Professor Ed Whitelaw, which indicates that the Defendants were not competing on price during the conspiracy period. If fact, Professor Whitelaw's analysis concludes that corn syrup prices were not only higher during the conspiracy period than can be explained by all the variables an economist would expect to influence the price of corn syrup, but also that they were higher by a greater increment than found in the HFCS market. Based on his econometric regression, Professor Whitelaw opines that it is more likely than not: (1) that suppliers of corn syrup engaged in collusive price fixing at the industry level during the conspiracy period, and (2) that the suppliers of

corn syrup charged Gray prices in excess of what would have prevailed during that time in a competitive market free from price fixing.[4]

Although the conduct evidence is quite voluminous, quantity is not necessarily a substitute for quality. In attempting to meet its burden, Gray relies largely on acts of price fixing in other industries by former ADM employees, as well as evidence suggestive of conscious parallelism and other conduct that is not probative of collusion as a matter or law. Even the economic experts essentially base their conclusions of economic plausibility on their examination of this circumstantial evidence and the drawing of inferences that can best be described as marginally supported by the record.

In order for Gray to survive at this stage of the litigation, the Court must be able to reach the conclusion that the evidence of record and any inferences reasonably drawn therefrom would be sufficient to allow a reasonable jury to conclude that Defendants participated in an illegal price fixing conspiracy in the corn syrup market. In light of the Seventh Circuit's opinion in the class case, which is controlling on this Court, the Court is compelled to conclude here that, when viewed in the light most favorable to Gray, the economic evidence, in combination with the totality of the rather ambiguous conduct evidence, is marginally sufficient to allow a reasonable inference that Plaintiffs' hypothesis of collusive action is "more plausible than that of individual action." *See In re Brand Name Prescription Drugs Antitrust Litigation,* 186 F.3d at 787. Therefore, as Gray has demonstrated a genuine issue of material fact requiring resolution at trial, Defendants' Motions for Partial Summary Judgment must be denied.

4. While Defendants criticize the conclusions drawn by Gray's experts and characterize the evidence as "weak", their criticisms go to

## CONCLUSION

For the reasons set forth above, Cargill's Motion for Summary Judgment [# 193] is DENIED; A.E. Staley's ("Staley") Motion for Summary Judgment [# 196] is DENIED; American Maize's Motion for Summary Judgment [# 192] is DENIED; and Archer Daniels Midland's ("ADM") Motion for Summary Judgment [# 191] is DENIED. As all pretrial proceedings have now been concluded, it is now time for this tag-along action to be REMANDED to the United States District Court for the District of Oregon, Portland Division, for trial. The Court takes this opportunity to commend all counsel who have worked on this case for their civility and professionalism. It has truly been a pleasure to preside over the pretrial phase of this litigation.

weight rather than admissibility and are contingent on assessments of credibility that cannot be made on summary judgment.