Jon S. NICHOLLS, Trustee, Peter G. Gonzales, Derek Humphreys, Thomas B. Humphreys, Jr., and Joseph Oblas, Plaintiffs,

v.

ZURICH AMERICAN INSURANCE GROUP, Aylor Insurance Agency, Inc., A.I. Credit Corp. a/k/a Aicco, and Crump E & S of California Insurance Services, Inc., Defendants.

No. CIV.A.01–WY1687CBOES.

United States District Court,
D. Colorado.

Feb. 7, 2003.

---

Mark Widmann Gerganoff, Frank & Finger, P.C., Evergreen, CO, Paul G. Quinn, U.S. Treasury Office, Denver, CO, for Jon S. Nicholls.

Peter Gonzales, Parker, CO, pro se.

Derek Humphreys, Parker, CO, pro se.

Thomas B. Humphreys, Jr., Parker, CO, pro se.

Joseph Oblas, Parker, CO, pro se.

John C. Parks, Laurence Murray McHeffey, Jane Elizabeth Young, Heather A. Lang, McElroy, Deutsch & Mulvaney, Denver, CO, for Zurich-American Ins. Group.

John Ernest Clough, Cooper & Clough, Denver, CO, for Aylor Ins. Agency, Inc.

Frederick J. Baumann, Craig Richard Welling, Rothgerber, Johnson & Lyons, LLP, United States District Court, Denver, CO, for AICCO.

John R. Rodman, INSURANCE SERVICES, John R. Rodman & Associates, Denver, CO, for Crump E&S of California Ins. Services.

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, DENYING PLAINTIFF–TRUSTEE'S MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT, AND DENYING PLAINTIFF–TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

BRIMMER, District Judge.

This case arises out of a bankruptcy filed by a juice smoothy business after its corporate directors and officers slurped up all of the business's assets. The matter is currently before the Court on: (1) Plaintiff–Trustee's Motion for Leave to File a Third Amended Complaint; (2) Defendant Zurich American Insurance Group's Motion for Summary Judgment; (3) Plaintiff–Trustee's Motion for Partial Summary Judgment; (4) Defendant Zurich American Insurance Group's Cross–Motion for Summary Judgment on All Issues Raised by Plaintiff–Trustee's Motion for Summary Judgment; (5) Defendant A.I. Credit Corp.'s Motion for Summary Judgment; (6) Defendant Crump E & S of California Insurance Services's Motion for Summary Judgment; and (7) Defendant Aylor Insurance Agency, Inc.'s Motion for Summary Judgment. Upon reading the briefs, hearing oral argument, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### Statement of the Parties and Jurisdiction

Plaintiff Jon S. Nicholls ("Plaintiff–Trustee") is the Chapter 7 Trustee for two debtor bankruptcy estates—Juice Stop International Inc. and Juice Stop Franchising Corp.—and serves in that capacity during the joint administration of the bankruptcy estates. Plaintiff–Trustee has secured an assignment of rights and a judgment against the *pro se* Plaintiffs in this action for $395,000. Plaintiff–Trustee proceeds in this action as judgment creditor, assignee, and on behalf of the two debtor bankruptcy estates. Plaintiff–Trustee is a resident of Colorado.

The four *pro se* Plaintiffs in this matter are Peter C. Gonzales, Derek S. Humphreys, Thomas B. Humphreys, Jr., and Joseph Oblas. Plaintiff Gonzales was the controller of Juice Stop International Inc. ("Juice Stop International") and Juice Stop Franchising Corp. ("Juice Stop Franchising"). Derek S. Humphreys was secretary and a director of the Juice Stop entities. Thomas B. Humphreys, Jr. was president and a director of the Juice Stop entities. Joseph Oblas was a founder of the Juice

Stop entities and held various positions as an officer and director of the Juice Stop entities. All four *pro se* Plaintiffs were shareholders in the Juice Stop entities. The four *pro se* Plaintiffs will be referred to as the "Directors and Officers" of the Juice Stop entities. All of the Directors and Officers are residents of Colorado.[1]

Zurich American Insurance Group ("Zurich") is a New York corporation with its principal place of business in Illinois. Zurich is licensed to conduct business in Colorado. Zurich issued a Directors and Officers Liability Reimbursement Policy, No. DOC–2395469–00 to 01, (the "D & O Liability Policy") to Juice Stop Franchising. The Directors and Officers Liability coverage under the policy was separate and distinct from the Company Reimbursement coverage, which is not at issue in this case.

Crump E & S of California Insurance Services, Inc. ("Crump") is incorporated, and has its principal place of business, in California. Crump is an insurance brokerage company and a licensed insurance producer/broker in Colorado. Crump produced and was involved in the marketing of the D & O Liability Policy issued by Zurich.

Aylor Insurance Agency, Inc. ("Aylor") is incorporated, and has its principal place of business, in California. Aylor is an insurance broker and retailer who helped procure the D & O Liability Policy issued by Zurich. Aylor procured the insurance policy through Crump. Aylor collected the down payment from Juice Stop Franchising and the balance from A.I. Credit Corporation, an insurance premium financing corporation, and transmitted the insurance premiums to Crump.

A.I. Credit Corporation, Inc. a/k/a AIC-CO ("AICCO") is incorporated in a state other than Colorado and has its principal place of business is in New York. AICCO is an insurance premium financing entity that financed the D & O Liability Policy issued by Zurich. AICCO entered into a Premium Finance Agreement with Juice Stop Franchising (account No. 1–10–6938–1) whereby AICCO agreed to finance the D & O Liability Policy in return for nine monthly payments of $6,263.05 from October 15, 1998, to June 15, 1999, for a total payment of $56,367.45. Juice Stop Franchising provided AICCO with the express authority to cancel the D & O Liability Policy upon non-payment and also to rescind cancellations and reinstate the policy. On December 10, 1998, AICCO issued a Notice of Cancellation of the D & O Liability Policy with an effective date of December 13, 1998.

The Court has jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper in the District of Colorado. 28 U.S.C. § 1391(a).

### Background

Juice Stop Franchising is a supplier of juice franchises, which in turn sell juice products (smoothies) at the retail level. In 1997, Aylor, an insurance retailer, was contacted by Juice Stop Franchising about insurance coverage. In response, Aylor obtained insurance quotes from Crump, a wholesale insurance broker, and submitted those quotes to Juice Stop Franchising. Crump had an agreement with Zurich that authorized Crump to place Zurich's directors and officers liability insurance.

In 1997, Juice Stop Franchising obtained the D & O Liability Policy from

---

1. The *pro se* Plaintiffs were Directors and Officers of both Juice Stop Franchising and Juice Stop International. Although the individuals are the same, the Court will refer to the actions taken by the *pro se* Plaintiffs in the capacity they were acting when they took the action because ignoring corporate formalities because the Directors and Officers were the same individuals would be contrary to corporate law and unfair to Defendants.

Zurich. Juice Stop Franchising financed the insurance policy through AICCO. Under the terms of the Premium Finance Agreement with AICCO, Zurich was paid the full premium due under the D & O Liability Policy and Juice Stop Franchising was required to make nine monthly installment payments to AICCO. The policy period was from August 26, 1997, to August 26, 1998. Pursuant to the Premium Finance Agreement, Juice Stop Franchising appointed AICCO as its "attorney-in-fact," which provided AICCO the authority to cancel the D & O Liability Policy for non-payment of the installments due under the terms of the Premium Finance Agreement.

On July 9, 1998, Zurich sent a letter to Crump informing it that Juice Stop Franchising's D & O Liability Policy would expire on August 26, 1998. (Zurich's Reply Br. in Supp. of Mot. for Summ. J., Exh. B). That letter informed Crump that Juice Stop Franchising's most recent annual and quarterly financial information would be necessary to underwrite a renewal policy; however, the letter also specifically stated that a "renewal application [was] not required" to be filed. (Id.). Pursuant to Endorsement No. 11 of the D & O Liability Policy, Zurich renewed the D & O Liability Policy for another year and amended the policy period to August 26, 1998, through August 26, 1999. (Second Am. Compl., at ¶5; Supplemental Unsworn Declaration of Neal N. Waiser in Supp. of Zurich's Mot. for Summ. J., Exh. 1; Unsworn Declaration of Jane E. Young in Supp. of Zurich's Reply Br. in Supp. of Mot. for Summ. J., Exh. A).

On September 16, 1998, in accord with Zurich's standard business practice, an insurance "binder" was issued for the renewed D & O Liability Policy. (Appendix of Exhibits to Zurich's Reply Br. in Supp. of Mot. for Summ. J., Exh. D, E). The binder for the D & O Liability Policy identified Juice Stop Franchising as the insured under the D & O Liability Policy from August 26, 1998, to August 26, 1999. (Id., Exh. E, at p. 2). Additionally, the premium due under the policy for the renewed term was financed through AICCO. (Pl.'s Br. in Supp. of Mot. for Summ. J., Exh. 9). The Premium Finance Agreement, which financed the renewed policy, indicated that Juice Stop Franchising was the insured under the D & O Liability Policy issued by Zurich from August 26, 1998, to August 26, 1999. (Id., at pp. 1, 4). Again, AICCO was appointed as Juice Stop Franchising's attorney-in-fact and given full authority to cancel the policy.

In 1998, Juice Stop Franchising was experiencing financial difficulties and trying to raise money. CapEx, a Denver venture capital firm, agreed to loan money to Juice Stop Franchising. However, because CapEx was apparently leery of the management ability and financial viability of Juice Stop Franchising, CapEx conditioned the loan on the termination of the salaries of the Directors and Officers (Thomas B. Humphreys, Derek Humphreys, and Joe Oblas) of Juice Stop Franchising. (Pl.-Trustee's Resp. to Mots. for Summ. J., at p. 7; Exh. 7, at pp. 180–81). Upset about their salary termination, the Directors and Officers of Juice Stop Franchising, who were also the Officers and Directors of Juice Stop International, proposed to sell some stock in Juice Stop International "to allow for them to live and to survive over the next year . . . ." (Id., Exh. 7, at p. 70). Juice Stop International is the parent company of Juice Stop Franchising. (Unsworn Declaration of John Cardinal Parks in Supp. of Zurich's Mot. for Summ. J., Exh. E, at p. 7).[2]

---

**2.** As part of Juice Stop Franchising's bankruptcy proceedings, it was required to file a "Statement of Financial Affairs." In this

Thus, in mid–1998, the Officers and Directors of Juice Stop International worked on and created a putative private placement of Juice Stop International's company stock. (Second Am. Compl., at ¶ 9; Unsworn Declaration of John Cardinal Parks in Supp. of Zurich's Mot. for Summ. J., Exh. D, at ¶ 4). The Officers and Directors approved, condoned, and authorized the private placement and sale of stock directly to third parties. (*Id.*). Through misrepresentations by the Directors and Officers of Juice Stop International, the third parties to these transactions were made to believe they were receiving stock directly from Juice Stop International and not from stock owned by insiders. (*Id.*).

After Juice Stop International collected all the funds from investors, the insiders received all of the proceeds directly from the putative private placement of Juice Stop International stock and none of the funds remained with the insolvent corporation. (*Id.*). According to company records, the stock certificates owned by the insiders were never turned in to Juice Stop International or accounted for in any way. (*Id.*). The Directors and Officers of Juice Stop International approved, condoned, and authorized this sham transaction and failed to place any safeguards to protect the interests of the corporation over their own interests in contravention of their duties and obligations as directors and officers. (Second Am. Compl., at ¶ 9; Unsworn Declaration of John Cardinal Parks in Supp. of Zurich's Mot. for Summ. J., Exh. D, at ¶ 23). As a result of the putative private placement of Juice Stop International stock, the *pro se* Plaintiffs—directors and officers of Juice Stop International and Juice Stop Franchising—pocketed $395,000, which investors be-

lieved was being invested in Juice Stop International. (Second Am. Compl., at ¶ 9–10; Declaration of John Cardinal Parks in Supp. of Zurich's Mot. for Summ. J., Exh. D, at ¶ 23).

On November 11, 1998, Juice Stop International filed a petition for relief under Chapter 11 of the Bankruptcy Code. On November 17, 1998, Juice Stop Franchising did the same. On May 28, 1999, the Bankruptcy Court for the District of Colorado consolidated the cases and converted both debtor corporations to Chapter 7 proceedings. The bankruptcy court also ordered that the debtor estates be jointly administered. Pursuant to that order, Plaintiff Jon S. Nicholls was appointed as the Chapter 7 Trustee for both debtor corporations.

On August 4, 2000, Plaintiff–Trustee filed an adversary proceeding in bankruptcy court against the Directors and Officers of the debtor corporations (i.e., the *pro se* Plaintiffs). In that proceeding, the Plaintiff–Trustee alleged that the Directors and Officers of the debtor corporations wrongfully withheld money from Juice Stop International that was obtained from the putative placement of Juice Stop International stock. On October 20, 2000, the Directors and Officers of the debtor corporations sent a letter to Zurich demanding that Zurich defend them in the bankruptcy adversary proceeding and indemnify them under the D & O Liability Policy. (Second Am. Compl., at ¶ 19). On December 6, 2000, Zurich responded to the Directors and Officers demand letter and denied that it had a duty to defend or indemnify because the D & O Liability Policy was cancelled on December 13, 1998. (*Id.* at ¶ 20). On May 21, 2001, as a result of the adversary proceeding in

statement, Juice Stop Franchising, identified Juice Stop International, Inc. as the "Parent Company of Debtor [Juice Stop Franchis-

ing]." (Unsworn Declaration of John Cardinal Parks in Supp. of Zurich's Mot. for Summ. J., Exh. E, at p. 7).

bankruptcy court, Plaintiff–Trustee entered into a stipulation with the *pro se* Plaintiffs wherein the *pro se* Plaintiffs stipulated to a judgment of $395,000 and an assignment of certain rights. (*Id.* at ¶ 28).

Based on Zurich's refusal to provide a defense or indemnification under the D & O Liability Policy, the Plaintiff–Trustee and *pro se* Plaintiffs filed suit in the District of Colorado against Zurich and other defendants.

### *Legal Standards*

A. Summary Judgment Standard.

Summary judgment is proper when there is no genuine issue of material fact to be resolved at trial. Fed.R.Civ.P. 56(c); *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993). Thus, a district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Nelson v. Geringer,* 295 F.3d 1082, 1086 (10th Cir.2002). "An issue of material fact is genuine where a reasonable jury could return a verdict for the party opposing summary judgment." *Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 797 (10th Cir.1997).

In applying these standards, the district court will view the evidence in the light most favorable to the party opposing summary judgment. *Jenkins v. Wood,* 81 F.3d 988, 990 (10th Cir.1996). The movant bears the initial burden of demonstrating the absence of evidence to support the non-moving party's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the non-moving party bears the burden of proof at trial, the burden then shifts to it to demonstrate the existence of an essen-

tial element of its case. *Id.* To carry this burden, the non-moving party must go beyond the pleadings and designate specific facts to show there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ford v. West,* 222 F.3d 767, 774 (10th Cir.2000). The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient to create a "genuine" issue of disputed fact. *Lawmaster v. Ward,* 125 F.3d 1341, 1347 (10th Cir.1997).

B. Choice of Law.

▓▓ A federal district court sitting in diversity must apply the substantive law of the forum state, including its choice of law rules. *Vitkus v. Beatrice Co.,* 127 F.3d 936, 942 (10th Cir.1997). Colorado courts employ the "most significant relationship" test to resolve conflict of law questions in contract cases. *Webb v. Dessert Seed Co.,* 718 P.2d 1057, 1066 (Colo.1986) (en banc). Under the "most significant relationship" test, a court considers five factors to determine the correct choice of law: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of subject matter of the contract; and (5) the domicile, residence, or place of business of the parties. *Vitkus,* 127 F.3d at 941 (citing Restatement (Second) Conflict of Laws § 188(2) (1969)).

▓▓ Although the producer of the D & O Liability Policy and several contracting parties were from California, Colorado contract law applies because the alleged coverage under the D & O Liability Policy arose out of conduct by the Directors and Officers of the Juice Stop entities, who had their principal places of business in Colorado. Additionally, Plaintiff–Trustee and the Directors and Officers of the Juice Stop entities are residents of Colorado.

## Analysis

I. *Plaintiff–Trustee's Motion for Leave to File Third Amended Complaint.*

The deadline for amending the pleadings was June 15, 2002. On December 10, 2002, Plaintiff–Trustee filed a Motion for Leave to File a Third Amended Complaint. Plaintiff–Trustee states the Third Amended Complaint "makes no new claims against any party except requesting additional declaratory relief involving AICCO." (Mot. for Leave to File Third Am. Compl., at ¶ 22) (emphasis omitted). Plaintiff–Trustee's stated reason for amending the Second Amended Complaint is to correct "the dates on which the Juice Stop entities filed bankruptcy and [to make] certain other stylistic changes." (*Id.* at ¶ 10).

After the permissive period, and without written consent of the adverse party, the decision to grant leave to amend a complaint is within the district court's discretion. Fed.R.Civ.P. 15(a). In exercising this discretion, the district court is guided by a number of factors, including whether: (1) the amendment will result in undue prejudice; (2) the request to amend was inexplicably delayed; (3) the amendment was offered in good faith; and (4) the party had sufficient opportunity to state a claim and failed. *Las Vegas Ice and Cold Storage Co. v. Far West Bank*, 893 F.2d 1182, 1185 (10th Cir.1990). The Tenth Circuit has stated that "[u]ntimeliness alone may be a sufficient basis for denial of leave to amend." *Id.*

The Court finds all the factors weigh against the Plaintiff–Trustee. First, the amendment will result in undue prejudice to Defendant AICCO. Plaintiff–Trustee requests the Court, for the first time, to "declare that AICCO stands in the shoes of the insurer and is legally bound to the indemnification promised under the insurance policy." (Third Am. Compl., at ¶ 47). Granting Plaintiff–Trustee leave to amend at this late stage in the litigation,

after discovery has closed and the parties have filed their motions for summary judgment, would prejudice all the parties in this action, particularly AICCO, who have conducted discovery and drafted their motions based on Plaintiff–Trustee's allegations in the Second Amended Complaint. Second, Plaintiff–Trustee's Motion for Leave to File Third Amended Complaint was inexplicably delayed; in fact, the only reason given now is to make certain "stylistic changes." Third, even if the Third Amended Complaint was filed in good faith, it contains several changes to the Second Amended Complaint that the court considers more than "stylistic." For example, Plaintiff–Trustee omits certain facts that were previously admitted, such as the fact that the policy term for the disputed insurance policy was renewed pursuant to an endorsement. (*Compare* Second Am. Compl., at ¶ 5 *with* Third Am. Compl., at ¶ 5). Fourth, Plaintiff–Trustee has not pointed to any "new evidence" on which the Motion for Leave to File a Third Amended Complaint is based; hence, Plaintiff–Trustee had a sufficient opportunity to state any claim for declaratory relief against AICCO when it filed its Second Amended Complaint.

Rule 15(a) provides that leave to amend shall be "freely given when justice so requires." Fed.R.Civ.P. 15(a). Justice does not require leave to amend in this case because of the prejudice such an amended complaint would have on Defendants. In addition, Plaintiff–Trustee's untimeliness—nearly six months after the close of the date to amend pleadings—is without sufficient explanation for delay. The Court also notes that it has construed Plaintiff–Trustee's Second Amended Complaint liberally and had already taken notice of Plaintiff–Trustee's typographical errors in the Second Amended Complaint regarding the dates on which the Juice Stop entities filed bankruptcy. Hence, the reasons for

filing the Third Amended Complaint—to correct the dates on which the Juice Stop entities filed bankruptcy and to make certain stylistic changes—have adequately been remedied and Plaintiff–Trustee will not be prejudiced in any manner by denial of leave to amend.

Therefore, Plaintiff–Trustee's Motion For Leave to File Third Amended Complaint is **DENIED.**

## II. *Defendant Zurich's Motion for Summary Judgment.*

Zurich makes three arguments in support of its motion for summary judgment: (1) Zurich owed no duty to defend under the D & O Liability Policy because the Directors and Officers of Juice Stop International who engaged in the sham stock transaction were not insureds under the D & O Liability Policy issued to the Directors and Officers of Juice Stop Franchising; (2) if the Directors and Officers of Juice Stop International were insureds under the D & O Liability Policy, they still are not covered because the "Personal Profit" exclusion in the policy applies; and (3) even if the D & O Liability Policy provides coverage, it is void as against public policy.[3] (Zurich's Mot. for Summ. J., at pp. 6–12).

The Plaintiff–Trustee responds that Zurich is estopped from asserting any of these defenses to coverage under the D & O Liability Policy and that: (1) Juice Stop International was an insured under the D & O Liability Policy because the name of the insured was changed on a renewal application for the 1998–1999 policy term; (2) the "Personal Profit" exclusion does not

apply to "wrongful acts" that are not illegal; and (3) the D & O Liability Policy is not void against public policy because the cases relied on by Zurich for the public policy of Colorado are inapposite and Zurich is, in effect, attempting to read an implied exclusion for intentional wrongful acts into the policy in contravention of well-established Colorado insurance law. (Pl.-Trustee's Resp. to Mots. for Summ. J., at pp. 13–17, 21–27).

### A. Relevant Provisions of the D & O Liability Policy.

Plaintiff–Trustee argues that summary judgment should be denied because a question of fact exists as to what document constitutes the D & O Liability Policy. (Pl.-Trustee Resp. to Mots. for Summ. J., at pp. 18–20). Although some confusion arose initially regarding the D & O Liability Policy issued by Zurich because the original was filed in Zurich's New York City office across from the World Trade Center at the time of the terrorist attacks of September 11, 2001, that confusion has subsequently been resolved. Zurich has stipulated that the D & O Liability Policy produced by the Plaintiff–Trustee is a true and accurate copy of the D & O Liability Policy issued by Zurich and has produced its own copy of the policy which is identical to the copy relied on by the Plaintiff–Trustee in drafting his Complaint. (*See* Unsworn Declaration of Jane E. Young in Supp. of Zurich's Reply Br. in Supp. of Mot. for Summ. J., Exh. A; Supplemental Unsworn Declaration of Neal N. Waiser in Supp. of Zurich's Mot. for Summ. J., Exh. 1). Therefore, the Court finds that there

---

**3.** In its reply brief, Zurich also argued that the Directors and Officers of Juice Stop International, assuming they are covered under the D & O Liability Policy, did not engage in any "wrongful conduct" and therefore are not covered under the policy. (Zurich's Reply Br. in Supp. of Mot. for Summ. J., at pp. 7–14).

The Court will not consider this argument because viewing the facts in light most favorable to Plaintiff–Trustee, the Directors and Officers of Juice Stop International engaged in wrongful conduct. (*See* Second Am. Compl., at ¶¶ 9–11; Pl.-Trustee's Resp. to Mots. for Summ. J., Exh. 10, ¶ 4).

is not a genuine issue of material fact as to what is the controlling D & O Liability Policy.

The provisions of the D & O Liability Policy pertaining to this motion are:

1. The Insuring Clause.

The Underwriter shall pay on behalf of the **Insured Persons** all **Loss** which the **Insured Persons** are not indemnified by the **Company** and which the **Insured Persons** become legally obligated to pay on account of any **Claim** first made against them, individually or otherwise, during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** taking place before or during the **Policy Period**. (Policy § I.A)

2. Definitions.

*Company* means, collectively, the **Parent Company** and its **Subsidiaries**. (Policy § III.B)

*Insured Persons,* either in singular or plural, means any one or more of those persons designated in Item 6 of the Declarations.[4] (Policy § III.F)

*Parent Company* means the organization designated in Item 1 of the Declarations.[5] (Policy § III.I)

*Subsidiary,* either in singular or plural, means any organization in which more than 50% of the outstanding voting securities or voting rights representing the present right to vote for election of directors is owned or controlled, directly or indirectly, in any combination, by one or more companies. (Policy § III.L)

*Wrongful Act* means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any of the **Insured Persons**, individually or otherwise, in their **Insured Capacity**, or any matter claimed against them solely by reason of their serving in such **Insured Capacity**. (Policy § III.M)

3. Exclusions.

The Underwriter shall not be liable under Insuring Clause A for **Loss** on account of any **Claim** made against any **Insured Person**: ... based upon, arising out of, or attributable to such **Insured Person** gaining in fact any personal profit, remuneration or advantage to which such **Insured Person** was not legally entitled. (Policy § IV.B.3)

B. Colorado Insurance Law.

1. Construction of Insurance Contracts.

 Insurance contracts, and endorsements to insurance contracts, are construed in accordance with general contract law. *FDIC v. Am. Cas. Co.,* 843 P.2d 1285, 1289 (Colo.1992); *Harper v. Gulf Ins. Co.,* No. 01–CV–201–J, 2002 U.S. Dist. LEXIS 24492, *18–19 (D.Wyo. Dec. 20, 2002) (explaining that endorsements are writings added to an insurance contract and are construed as embodied in the contract). Construction of an insurance contract is a question of law to be determined by the court. *United States Fid. & Guar. Co. v. Morrison Grain Co.,* 734 F.Supp. 437, 442 (D.Kan.1990) *aff'd* 999 F.2d 489 (10th Cir.1993); *Safeco Ins. Co. v. Robertson,* 994 P.2d 488, 490 (Colo.App.1999).

---

**4.** "Item 6 of the Declarations" provides: "Insured Persons: any person who has been, now is or shall become a duly elected director or a duly elected or appointed officer of the Company[.]"

**5.** "Item 1 of the Declarations" provides: "Parent Company and Address: Juice Stop Franchising Corp....."

If an insurance policy is clear and unambiguous, it should be enforced according to its plain terms. *FDIC v. Am. Cas. Co.*, 843 P.2d at 1290. In such a case, the court will look to the language of the policy to determine the intent of the parties and construe the policy according to its terms to give effect to that intent. *Robertson*, 994 P.2d at 490. The Colorado Supreme Court has repeatedly cautioned that "[c]ourts are not to rewrite or limit unambiguous policy provisions by strained construction, ... or force an ambiguity in order to resolve it against an insurer. An insurer cannot be held liable beyond the scope of risks which have been clearly covered in the insurance policy." *City of Arvada v. Colo. Intergovernmental Risk Sharing Agency*, 988 P.2d 184, 186 (Colo. App.1999) (citing *Parrish Chiropractic Centers, P.C. v. Progressive Cas. Ins. Co.*, 874 P.2d 1049 (Colo.1994); *Kane v. Royal Ins. Co.*, 768 P.2d 678 (Colo.1989)).

If the terms of an insurance contract are ambiguous, the court should construe the policy against the insurer and in favor of coverage. *FDIC v. Am. Cas. Co.*, 843 P.2d at 1290; *Fire Ins. Exch. v. Bentley*, 953 P.2d 1297, 1300 (Colo.App. 1998). Whether the insurance contract is ambiguous is a question of law. *Robertson*, 994, P.2d at 490. A term or clause in an insurance policy is ambiguous if "it is reasonably susceptible to different meanings." *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 619 (Colo.1999) (quoting *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo.1990)). However, the mere fact that the parties disagree about the meaning or scope of an insurance policy provision does not create an ambiguity. *FDIC v. Am. Cas. Co.*, 843 P.2d at 1290.

Whether the disputed insurance policy is unambiguous or ambiguous, when the facts in the case are admitted or uncontroverted, the court may determine whether the terms of the insurance policy are applicable to the facts at hand. *Morrison Grain Co.*, 734 F.Supp. at 442.

2. Duty to Defend and Insurance Policy Exclusions.

In Colorado, an "insurer's duty to defend arises when the underlying complaint alleges facts that might fall within the policy's coverage." *City of Arvada*, 988 P.2d at 186. Moreover, if "those allegations potentially come within policy coverage, or if there is even some doubt, the insurer must defend the claim. The insurer must defend against all claims if some potentially covered claims are alleged." *TerraMatrix, Inc. v. United States Fire Ins. Co.*, 939 P.2d 483, 486 (Colo.App.1997).

The Colorado Supreme Court has noted that an "insurer seeking to avoid its duty to defend an insured bears a heavy burden." *Compass Ins. Co.*, 984 P.2d at 613. This burden "necessary for an insurer to prevail on a duty-to-defend claim holds true in the specific context of a determination of whether insurance coverage does not exist because one of the policy's exclusions applies[.]" *Id.*

For an insurance policy exclusionary clause to be enforced it must be drafted in clear and specific language. *Prudential Prop. & Cas. Co. v. LaRose*, 919 P.2d 915, 917 (Colo.App.1996). To benefit from an exclusionary clause, the insurer must establish that the exclusion applies and is not subject to any other reasonable interpretation. *Am. Family Mut. Ins. Co. v. Johnson*, 816 P.2d 952, 954 (Colo.1991). In sum,

> [t]he insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusion in the insurance policy. An insurer is not excused from its duty to defend unless there is no factual or legal basis on

which the insurer might eventually be held liable to indemnify the insured. *Compass Ins. Co.*, 984 P.2d at 614. However, if "there is no duty to defend, there is no duty to indemnify." *City of Arvada*, 988 P.2d at 186.

C. Equitable Estoppel.

In Colorado, the doctrine of equitable estoppel is not favored and the party asserting estoppel has the burden of demonstrating that all the elements of estoppel apply. *Dove v. Delgado*, 808 P.2d 1270, 1275 (Colo.1991). The Colorado Supreme Court has explained:

There are four basic elements to an estoppel: (1) The party to be estopped must know the facts; (2) this party also must intend that her conduct be acted on or must so act that the party asserting the estoppel has a right to believe the other party's conduct is so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the other party's conduct to her injury.

*Id.* With respect to insurance contracts, the Colorado Supreme Court has held that the doctrine of estoppel cannot, based on the conduct of the insurer, bring within coverage of a insurance policy risks not covered by its terms or risks expressly excluded from the policy. *Empire Cas. Co. v. St. Paul Fire and Marine Ins. Co.*, 764 P.2d 1191, 1198 (Colo.1988) (quoting *Hartford Live Stock Ins. Co. v. Phillips*, 150 Colo. 349, 372 P.2d 740, 742 (1962)).

D. Application.

1. "Insureds" Under the D & O Liability Policy.

Zurich argues that it did not have a duty to defend the Directors and Officers of Juice Stop International because they were not insureds under the D & O Liability Policy issued to the Directors and Officers of Juice Stop Franchising. Plaintiff-

Trustee responds that Zurich should be estopped from denying coverage because it did not assert that Juice Stop International was uninsured under the policy when it declined to defend the Directors and Officers (in their capacities as directors and officers of both Juice Stop entities) in the adversarial bankruptcy proceedings in 2000. (Pl.-Trustee's Resp. to Mots. for Summ. J., at pp. 13–15, Exh. 10, at ¶¶ 1–8). Alternatively, Plaintiff–Trustee argues that a purported renewal application reflects a change in the named parent company under the D & O Liability Policy from Juice Stop Franchising to Juice Stop International. (*Id.*, at pp. 5–6, 15–17).

The sham stock transaction which gave rise to the $395,000 the Plaintiff–Trustee is seeking to recover was conducted by the *pro se* Plaintiffs in their capacities as Directors and Officers of Juice Stop International. Pursuant to the D & O Liability Policy, an insured person is "[a]ny person who has been, now is or shall become a duly elected director or duly elected or appointed officer of the Company." (Policy § III.F, Declarations Item 6). The D & O Liability Policy defines "Company" as the "Parent Company and its subsidiaries." (Policy § III.B). In turn, the "Parent Company" is defined as "the organization designated in Item 1 of the Declarations." (Policy § III.I). Item 1 of the Declarations states that the Parent Company is "Juice Stop Franchising Corp." Therefore, the wrongful acts committed by the Directors and Officers of Juice Stop International, the parent company (and not a subsidiary) of Juice Stop Franchising, do not fall under the Insuring Clause of the D & O Liability Policy because there were no "wrongful acts" committed by "Insured Persons." (Policy § I.A).

The Court will enforce the D & O Liability Policy according to its plain terms be-

cause the policy is clear and unambiguous. The intent of Zurich and Juice Stop Franchising when they entered into the insurance contract was to provide directors and officers liability coverage for Juice Stop Franchising and its subsidiaries. The Court will not rewrite the provisions of the D & O Liability Policy to provide coverage for any entity affiliated with Juice Stop Franchising, such as a parent corporation like Juice Stop International. The Colorado Supreme Court has instructed that an insurer cannot be held liable beyond the scope of risks which are covered in the insurance policy. Consequently, Zurich is not liable for the wrongful acts committed by the Directors and Officers of Juice Stop International, the parent company of Juice Stop Franchising, because such acts are beyond the scope of risks covered in the D & O Liability Policy.

■ Plaintiff–Trustee's argument that Zurich is estopped from denying coverage under the D & O Liability policy is rejected because, among other things, the Plaintiff–Trustee, the party asserting estoppel, could not have been "ignorant of the true facts" surrounding the denial of insurance coverage in 2000. Plaintiff–Trustee had knowledge of the true facts because before the bankruptcy adversary proceeding began he was aware of the existence of the D & O Liability Policy and the amount of the claims he intended to assert against the *pro se* Plaintiffs. (Appendix of Exhibits to Reply Br. in Supp. of Zurich's Mot. for Summ. J., at Exh. U). Additionally, the doctrine of equitable estoppel cannot be asserted to bring within the scope of an insurance policy risks that are not covered by the policy. Thus, because the actions of the Directors and Officers of Juice Stop International were not covered by the D & O Liability Policy, the doctrine of estoppel is no help to the Plaintiff–Trustee.

Plaintiff–Trustee also argues that Juice Stop International was an insured under the renewed D & O Liability Policy because on a purported renewal application for the 1998–1999 policy term someone crossed out the words "Franchising Corp." and handwrote in "International Inc." after "Juice Stop" in the space providing the name of the parent company. (*See* Pl.-Trustee's Resp. to Mots. for Summ. J., Exh. 6 (Depo.Exh. 26)).[6] Therefore, the Plaintiff–Trustee contends that the purported renewal application reflects a "manifest, deliberate intent not to obtain insurance for [Juice Stop Franchising] and instead to obtain insurance for [Juice Stop International]." (Pl.-Trustee's Resp. to Mots. for Summ. J., at p. 16) (emphasis omitted). The Court disagrees with the Plaintiff–Trustee for two reasons.

First, Zurich specifically stated an application was not required to renew the D & O Liability Policy and although a renewal application was submitted to Crump, and Crump transmitted that purported renewal application to Zurich, Crump continued to refer to Juice Stop Franchising as the insured under the policy. (*See* Pl.-Trustee's Mot. for Summ. J., Exh. 6 (Depo.Exh. 66)). Frank Thompson, manager of the underwriters who drafted the D & O Liability Policy issued by Zurich, testified that the renewal application was not part of the D & O Liability Policy issued to Juice Stop Franchising, thus making the interlineation of "Franchising Corp." on the purported renewal application irrelevant.

---

**6.** Plaintiff–Trustee also cites a letter from Crump to Zurich for the proposition that Juice Stop International was the parent company on the declarations page of the D & O Liability Policy. (*See* Pl.-Trustee's Resp. to Motions for Summ. J., at Exh. 6 (Depo.Exh. 66)). In that letter, Crump stated: "Enclosed is your completed renewal application, financials and an updated list of Directors and Officers for the captioned renewal." However, the "captioned renewal" provided "Juice Stop Franchising Corp. DOC239546900" as the insured.

(Depo. of Frank Thompson, at pp. 7–8, 162). Additionally, Zurich's internal underwriting documents evidence that it "renewed" the D & O Liability Policy for the 1998–1999 policy term as opposed to issuing a policy to a "New Business" as it would do when it deals with new clients seeking to be insured.

Second, an insurance "binder" was issued for the renewed D & O Liability Policy, which clearly identified Juice Stop Franchising as the insured under the D & O Liability Policy. (Appendix of Exhibits to Reply Br. in Supp. of Mot. for Summ. J., Exh. E). At the hearing in this matter, Zurich stated that the binder was sent to Juice Stop Franchising and it never objected or informed Zurich that it had issued an insurance policy to the wrong entity. Surely if Juice Stop Franchising did not intend to be the insured under the D & O Liability Policy, it would have stated some sort of objection to the issuance of a renewal policy it did not want. However, instead of objecting, Juice Stop Franchising *financed* the payment of the premium for the D & O Liability Policy for the 1998–1999 policy term. (Pl.-Trustee's Mot. for Summ. J., Exh. 9). For the Court to find that Juice Stop Franchising was not the insured under the D & O Liability Policy, it would have to find that Juice Stop Franchising entered into a financing agreement and agreed to pay $56,367.45 for an insurance policy that it did not want. This is contrary to the clear expression of intent in both contracts—the D & O Liability Policy issued by Zurich and the Premium Financing Agreement issued by AICCO.

The evidence submitted by the parties demonstrates that Juice Stop Franchising was the insured under the D & O Liability Policy issued by Zurich for the 1998–1999 policy period. Plaintiff–Trustee has point-

ed to a scintilla of evidence, the interlineation of "Franchising Corp." on the unsolicited application, indicating that D & O Liability Policy may be ambiguous as to who was an insured. However, a mere scintilla of evidence is insufficient to create a genuine issue of disputed fact for purposes of avoiding summary judgment.

2. "Personal Profit" Exclusion Under the D & O Liability Policy.

■ The Court also finds that even if Juice Stop International was an insured under the D & O Liability Policy, coverage still does not exist under the policy because the Personal Profit exclusion in the policy applies. The Personal Profit exclusion provides that Zurich will not be liable on any claim by an insured "based upon, arising out of, or attributable to such Insured Person gaining in fact any personal profit, remuneration or advantage to which such Insured Person was not legally entitled." (Policy § IV.B.3) (emphasis omitted). Zurich contends that based on the Plaintiff–Trustee's allegations, the Directors and Officers of Juice Stop International received a personal profit to which they are not legally entitled. (Zurich's Br. in Supp. of Mot. of Summ. J., at pp. 9–10; *see also* Second Am. Compl., at ¶¶ 9–10).

Plaintiff–Trustee responds that the Directors and Officers of Juice Stop International did not personally gain a profit because "[e]ach *pro se* Plaintiff voted in favor of the remaining *pro se* Plaintiffs receiving the sale proceeds from the company." (Pl.-Trustee's Resp. to Mots. for Summ. J., at p. 22). However, Plaintiff–Trustee goes on to explain that "the express purpose of the sale of stock was *not* to benefit the corporation or protect the corporation's rights. The purpose was to benefit the *pro se* Plaintiffs." (*Id.* at p. 23) (emphasis in original).[7] In other words, Plaintiff–

7. Plaintiff–Trustee also argues that while the transaction was a "wrongful act" under the D

& O Liability Policy, the act was not "illegal"

Trustee is arguing that "Director A" voted for "Director B" to receive the benefits of the sham transaction, and "Director B" likewise voted for "Director A" to receive the benefits of the sham stock transaction; therefore, neither "Director A" nor "Director B" received a "personal" profit. The Court disagrees with this logic for the reasons "embraced by that well-worn adage that 'two wrongs do not make a right.'" *Gray v. Mississippi,* 481 U.S. 648, 663, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987).

More importantly, however, Plaintiff–Trustee's Second Amended Complaint specifically states that "the insiders received all of the proceeds directly from the putative private placement [of Juice Stop International Stock] and none of the funds remained with the debtor corporations." (Second Am. Compl., at ¶ 9). Therefore, if none of the proceeds from the sale of stock remained with Juice Stop International and the stock transaction allowed the Directors and Officers of Juice Stop International to, in the Plaintiff–Trustee's own words, "pocket $395,000 of monies which the investors believed were being invested in [Juice Stop] International[,]" then the Directors and Officers had to receive a personal profit. (Unsworn Declaration of John Cardinal Parks in Supp. of Zurich's Mot. for Summ. J., at Exh. 9, p. 8, ¶ 23). Thus, because it is safe to assume that the Directors and Officers of Juice Stop International did not use the proceeds from the sham stock transaction for an eleemosynary purpose, those Directors and Officers gained in fact a personal profit.

The Court finds the Directors and Officers retained the $395,000 from the sham stock transaction for personal profit. This conclusion is supported by the evidence. Juice Stop Franchising was in financial disarray and to save the corporation, the Directors and Officers of Juice Stop Franchising applied for a loan. This loan was conditioned upon terminating the salaries of the Directors and Officers of Juice Stop Franchising. Peter Gonzales, the only director of either Juice Stop entity deposed in this case, testified that the sham transaction was proposed to allow the Directors and Officers to live and survive during the next year they were operating Juice Stop Franchising without any salaries. After the sham stock transaction, the Directors and Officers received roughly the same amount of money they were receiving prior to the termination of their salaries. The unmistakable conclusion is that the sham stock transaction was entered into to pay the Directors and Officers personally and that they received a profit as a result.

The Personal Profit exclusion in the D & O Liability policy is drafted in clear and specific language. The reasons for such an exclusion are equally clear—to prevent the looting of corporate assets by directors and officers and then, after being forced to remit the funds, turning to an insurer seeking indemnification for their wrongful acts under a directors and officers policy. Zurich may benefit from the Personal Profit exclusion because viewing the evidence in the light most favorable to Plaintiff–Trustee, the evidences establishes that the exclusion applies and is not subject to any other reasonable interpretation. Therefore, because the allegations in Plaintiff–Trustee's Second Amended Complaint were entirely within the Personal Profit exclusion, Zurich had no duty to defend. As the Colorado Supreme Court

and therefore the Personal Profit exclusion does not apply. (Pl.-Trustee's Resp. to Mots. for Summ. J., at p. 23). The Court notes that under Colorado law directors and officers of a corporation have a statutory duty to discharge their duties in "a manner he or she reasonably believes to be in the best interests of the corporation." Colo.Rev.Stat. Ann. § 7–108–401(1)(c).

has explained, where there is no duty to defend, there is no duty to indemnify.[8]

### E. Conclusion.

For the foregoing reasons, Zurich's Motion for Summary Judgment is **GRANTED** and the Plaintiff–Trustee's Second, Third, Fourth, Fifth, Six, and Ninth (with respect to Defendant Zurich) Claims for Relief are **DISMISSED**.[9]

III. *Plaintiff–Trustee's Motion for Partial Summary Judgment on his First Claim for Relief—Declaratory Judgment and Breach of Automatic Stay by Zurich—and Zurich's Cross–Motion for Summary Judgment on that Claim.*

Plaintiff–Trustee seeks a declaration by the Court that the D & O Liability Policy issued for the period August 26, 1998, to August 26, 1999, remained in effect during that entire period and Zurich's purported cancellation of the D & O Liability Policy violated the Bankruptcy Code's automatic stay. (Pl.-Trustee's Mot. for Summ. J., at p. 1). Plaintiff–Trustee argues that after Juice Stop Franchising filed bankruptcy on November 17, 1998, the D & O Liability Policy was property of the bankruptcy estate; therefore, the cancellation of the policy on December 13, 1998, was void because it violated the automatic stay. (Pl.-Trustee's Br. in Supp. of Mot. for Summ. J., at pp. 13–15). Zurich responds that the D & O Liability Policy issued to Juice Stop Franchising was not "property" of the debtor's estate and therefore is outside the scope of the automatic stay. (Zurich's Br.

in Supp. of Cross–Mot. for Summ. J., at pp. 8–13). The Court, however, does not need to reach either of these arguments under Tenth Circuit law.

### A. The Bankruptcy Code's Automatic Stay.

Upon the filing of a bankruptcy petition, the Bankruptcy Code provides for an automatic stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The "automatic stay pertains only to actions involving the debtor or property of the estate." *In re Priestley*, 93 B.R. 253, 261 (Bankr.D.N.M. 1988). In turn, the Bankruptcy Code defines "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). A directors and officers liability insurance policy is considered "property of the estate" if it increases the debtor's worth or diminish its liabilities. *In re Zenith Labs.*, 104 B.R. 659, 665 (D.N.J.1989) (holding directors and officers liability policy was not "property of the estate" because it did not increase or decrease the worth of the bankruptcy estate); *In re Minoco Group of Cos., Ltd.*, 799 F.2d 517, 519 (9th Cir.1986) (holding directors and officers liability policy was "property of the estate" because the estate was worth more with indemnification coverage than without the coverage).

---

**8.** The Court will not address Zurich's argument that the D & O Liability Policy is void as against the public policy of Colorado because of the Court's disposition of the matter under the plain language of the policy and the fact that the argument raises unsettled issues of Colorado law.

**9.** Plaintiff–Trustee's Fifth Claim for Relief asserts a claim for deceptive trade practices by Zurich. (*See* Pl.-Trustee's Second Am. Compl., at ¶¶ 66–71). Plaintiff–Trustee did not brief this claim, however, because the claim appears to be premised on Plaintiff–Trustee's bad faith claim which has been dismissed, the Fifth Claim for Relief may be summarily dismissed.

In the Tenth Circuit, a "contract that provides for termination on default of one party may terminate under ordinary principles of contract law even if the defaulting party has filed a petition under the Bankruptcy Act." *In re Trigg,* 630 F.2d 1370, 1374 (10th Cir.1980).[10] In *Trigg,* the debtor's oil and gas leases provided that if wells on the demised property were not capable of producing oil and gas in paying quantities, then the debtor-lessee would have to pay annual delay rentals to keep the leases in force. *Id.* at 1372. After the debtor failed to pay the delay rentals, the debtor filed an adversary proceeding in the bankruptcy court to prevent the termination of the leases. *Id.* Affirming the bankruptcy court and district court, the Tenth Circuit held that termination of the lease did not violate the bankruptcy laws because "the debtors failed to satisfy their contractual obligation to make the delay rental payments on their oil and gas leases. The leases lapsed by their own terms. The bankruptcy court was powerless to rewrite those terms for the parties." *Id.* at 1374.

Although the issue has never arisen in the Tenth Circuit, other courts have recognized the applicability of the Tenth Circuit's holding in *Trigg* in the context of insurance contracts. For example, in *J.E. Adams Indus., Ltd. v. Aurora Nat'l Life Assurance Co.,* the Northern District of Iowa considered whether a post-petition cancellation of a life insurance policy violated the automatic stay imposed by section 362(a)(3) of the Bankruptcy Code. 269 B.R. 808, 811–12 (N.D.Iowa 2001). There, the defendant insurance company cancelled the debtor's life insurance policy for non-payment of premiums while the debtor was operating its company as debtor-in-possession. *Id.* at 811. The court, relying

on *Trigg,* held that the post-petition cancellation of the insurance policy for non-payment of premiums did not violate the automatic stay because the automatic stay does not permit a court to rewrite the insurance policy to prevent the termination of a contract by its own terms. *Id.* at 812–13. The court reasoned that to permit a debtor or trustee to overlook nonpayment of premiums and later claim that the insurance contract is still enforceable despite its terms is contrary to the equitable purposes behind the automatic stay and may have the deleterious effect of undermining confidence in the certitude of contracts and the judicial system. *Id.* at 814; *see also In re B & K Hydraulic Co.,* 106 B.R. 131, 134 (Bankr.E.D.Mich.1989); *In re Meinke, Peterson & Damer, P.C.,* 44 B.R. 105, 108–109 (Bankr.N.D.Tex.1984). In short:

> A debtor or trustee cannot overlook payment of premiums and later claim the insurance contract is extended and still enforceable. The principle applies under the automatic stay provisions of § 362. The automatic stay applies to prevent a creditor from taking affirmative steps to forfeit or foreclose an interest or to collect a debt, but it does not normally impair the terms of contracts concerning expiration.

*In re B & K Hydraulic Co.,* No. 90–2034, 1991 WL 93191 at *1–*2, 1991 U.S.App. LEXIS 12127, *4–5 (6th Cir.1991).

B. Application.

Pursuant to Endorsement No. 11 of the D & O Liability Policy, Juice Stop Franchising renewed the insurance policy for a one year term commencing August 26, 1998, to August 26, 1999. (Second Am. Compl., at ¶ 5). Juice Stop Franchising filed for bankruptcy, and the automatic

10. Although *In re Trigg,* 630 F.2d 1370 (10th Cir.1980) was decided under the Bankruptcy Act, its holding is still valid. *See In re B & K* *Hydraulic Co.,* 106 B.R. 131, 134 (Bankr. E.D.Mich.1989).

stay went into effect, on November 17, 1998.

### 1. The Premium Finance Agreement.

Under the terms of the Premium Finance Agreement between Juice Stop Franchising and AICCO, Zurich was paid the full premium due under the D & O Liability Policy and Juice Stop Franchising was required to make nine monthly installment payments to AICCO. (Pl.-Trustee's Mot. for Summ. J., at Exh. 9). The Premium Finance Agreement named AICCO as Juice Stop Franchising's attorney-in-fact and gave AICCO full authority to cancel the D & O Liability Policy for non-payment of the installments due under the contract. (*Id.* at p. 1, ¶ 2).

The Premium Finance Agreement provided that upon non-payment of an installment due under the contract, Juice Stop Franchising would be in default and AICCO could exercise its power of attorney to cancel the policy. (*Id.* at p. 2, ¶ 3). In so cancelling, AICCO was obligated to issue a "Notice of Intent to Cancel" to Juice Stop Franchising, and if the default was not cured in ten days, then AICCO could cancel the policy. (*Id.*). When it cancelled the D & O Liability Policy, AICCO was required to send a Notice of Cancellation to Zurich and Juice Stop Franchising informing them that the Policy was cancelled. (*Id.*). Zurich could rely on whatever AICCO told it regarding the D & O Liability Policy. (*Id.* at p. 2, ¶ 3).

### 2. Termination Under the Terms of the D & O Liability Policy.

The D & O Liability Policy provided that it would terminate, among other things, on "the effective date of termination specified in written prior notice by the Parent Company [Juice Stop Franchising] to the Underwriter [Zurich]." (Policy § M.1). Under the terms of the Premium Finance Agreement, Juice Stop Franchising gave AICCO the power to terminate the D & O Liability Policy; hence, upon written notice of termination by AICCO the D & O Liability Policy would terminate pursuant to section M.I. Zurich was permitted to rely on AICCO's representations that the D & O Liability Policy was cancelled without contacting Juice Stop Franchising.

### 3. Cancellation of the D & O Liability Policy.

In November 1998, Juice Stop Franchising failed to make its monthly installment due under the Premium Finance Agreement and was in default under that Agreement. As a result, on November 30, 1998, AICCO issued a Notice of Intent to Cancel the D & O Liability Policy. (AICCO's Resp. to Pl.-Trustee' Mot. for Summ. J., Exh. B). The Notice of Intent to Cancel informed Juice Stop Franchising that it had ten days to cure the default (by December 9, 1998), and absent a cure, AICCO would exercise its power of attorney to cancel the D & O Liability Policy. (*Id.*). By December 10, 1998, Juice Stop Franchising had not cured its default; therefore, AICCO issued a Notice of Cancellation of the D & O Liability Policy stating the cancellation would be effective December 13, 1998. (*Id.* at Exh. C). Pursuant to this Notice of Cancellation, Zurich cancelled the Policy effective December 13, 1998. (Pl.-Trustee's Br. in Supp. of Mot. for Summ. J., at pp.7–8; Coles' Aff., at Exh. 43).

However, after mailing the Notice of Cancellation, AICCO spoke with Mr. Gonzales who informed AICCO of Juice Stop Franchising's bankruptcy. This was the first time AICCO learned that Juice Stop Franchising had filed bankruptcy. (Stratton Depo., at pp. 84–85). After being informed of the bankruptcy, AICCO issued a request that the D & O Liability Policy be reinstated pursuant to Juice Stop Fran-

chising's request. (Pl.-Trustee's Br. in Supp. of Mot. for Summ. J., Exh. 21). Zurich declined Juice Stop Franchising's request for reinstatement and refunded the unearned premium to AICCO in due course. (*Id.* at p. 8; Aylor Depo. Exh. 23). Additionally, the request for reinstatement also provided an "IMPORTANT MESSAGE" to Juice Stop Franchising:

THE POLICIES LISTED ABOVE ARE CANCELLED AND ARE NOT IN FORCE UNTIL THE INSURANCE COMPANY ADVISES YOU TO THE CONTRARY. IF YOU ARE NOT ADVISED PROMPTLY, CONTACT YOUR INSURANCE AGENT. IF YOUR INSURANCE COVERAGE IS NOT REINSTATED, ALL PAYMENTS MADE FOLLOWING CANCELLATION WILL BE CREDITED TO YOUR ACCOUNT. THE FACT THAT YOU CONTINUE TO MAKE PAYMENTS TO AICCO DOES NOT MEAN YOUR INSURANCE IS IN FORCE. ONLY THE INSURANCE COMPANIES OR YOUR AGENT CAN ADVISE YOU AS TO THE STATUS OF YOUR COVERAGE.

(*Id.*) (emphasis in original).[11]

The evidence demonstrates that AICCO and Zurich proceeded according to their respective rights under the various contracts. The D & O Liability Policy terminated pursuant to its own terms when Juice Stop Franchising failed to make its premium installments. The D & O Liability Policy was cancelled "on the effective date of termination" specified in the written notice from AICCO, acting on behalf of Juice Stop Franchising, to Zurich. (Policy § M.1). Zurich did not have to take any affirmative action to cancel the D & O Liability Policy; rather, the policy cancelled by its own terms on December 13, 1998, when AICCO issued the written notice of cancellation for non-payment of premiums. Therefore, as was the case in *Trigg*, 630 F.2d at 1370 and *J.E. Adams Indus.*, 269 B.R. at 811, Juice Stop Franchising failed to satisfy its contractual obligations to make the required payments and the contract terminated by its own terms. That the D & O Liability Policy cancelled post-petition is irrelevant because the court is powerless to rewrite the terms of the D & O Liability Policy to prevent its termination by its own terms.

■ Neither AICCO nor Zurich violated the Bankruptcy Code's automatic stay. AICCO did not violate the automatic stay when it sent the notices of intent to cancel or the notice of cancellation of the D & O Liability Policy because

the notices [were] required of [AICCO] pursuant to the terms of the Policy [and Premium Finance Agreement], and in effect, [sought] to prevent the situation Debtor is now in—claiming it did not know of the expiration and seeking benefit of a lapsed Policy. Debtor's failure to pay the ... premium and to act according to the terms of the Policy cancelled the Policy.

*In re J.E. Adams Indus.*, 269 B.R. at 813. This is particularly true in this case, where

---

11. There is some dispute about whether AICCO mailed Juice Stop Franchising's Request for Reinstatement to the wrong address by sending it to a Zurich office in Georgia. The Court considers this issue immaterial because the Request for Reinstatement clearly informed Juice Stop Franchising that the D & O Liability Policy was cancelled and not in force until Zurich advised Juice Stop Franchising to the contrary. Zurich never advised Juice Stop Franchising that the D & O Liability Policy was reinstated. Thus, Juice Stop Franchising had notice of Zurich's election not to reinstate the policy. Apparently, Juice Stop Franchising took no further action regarding the D & O Liability Policy notwithstanding the instruction that if it was not advised "promptly" of reinstatement, it was required to contact its insurance agent.

the request for reinstatement of the D & O Liability Policy informed Juice Stop Franchising in conspicuous and unequivocal language that it had a duty to confer with the insured to make sure its insurance policy was in force. Juice Stop Franchising will not be permitted to shift its loss, due to its own nonfeasance, to AICCO for *performing* the contract entered into with Juice Stop Franchising.

Zurich did not violate the automatic stay because it did not take any post-petition affirmative act to cancel the D & O Liability Policy; it simply received notice of the cancellation and remitted the unearned premium. The Court will not rewrite the D & O Liability Policy to read, as Plaintiff–Trustee urges, that "upon non-payment of the premiums due under the policy and its cancellation, Zurich will be obligated to reinstate the policy after it has been cancelled upon notification by the insured that it has filed bankruptcy." As explained by the Sixth Circuit, a "debtor or trustee cannot overlook payment of premiums and later claim the insurance contract is extended and still enforceable." *In re B & K Hydraulic Co.,* 1991 WL 93191 at **1–2, 1991 U.S.App. LEXIS at *4–5.

### C. Conclusion.

For all the aforementioned reasons, Plaintiff–Trustee's Motion for Summary Judgment is **DENIED** and Zurich's Cross–Motion for Summary Judgment is **GRANTED**. Therefore, Plaintiff–Trustee's First Claim for Relief against Zurich is DISMISSED.

### IV. *Defendants AICCO, Crump, and Aylor's Motions for Summary Judgment.*

Anticipating a finding of no coverage under the D & O Liability Policy, Plaintiff–Trustee alleged in the alternative: (1) a negligence claim against AICCO, Crump, and Aylor; (2) a misrepresentation or promissory estoppel claim against Aylor and AICCO; and (3) a conversion and unjust enrichment claim against AICCO, Crump, and Aylor. (Second Am. Compl., at ¶¶ 81–99).

### A. Defendant AICCO's Motion for Summary Judgment.

█ Plaintiff–Trustee asserts that AICCO is liable under an unjust enrichment theory for overpayments made by Juice Stop Franchising to AICCO under the terms of the Premium Finance Agreement. (Second Am. Compl., at ¶¶ 95–99; Pl.-Trustee's Resp. to Mots. for Summ. J., at pp. 26–28). AICCO responds that it could not have been unjustly enriched because it refunded the amounts of the overpayment to Juice Stop Franchising. (AICCO's Reply in Supp. of Mot. for Summ. J. on Coverage Issues, at pp. 4–5).

█ In Colorado, for Plaintiff–Trustee to recover for unjust enrichment he must show that: "(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Salzman v. Bachrach,* 996 P.2d 1263, 1265–66 (Colo.2000). None of those elements have been satisfied in this case.

AICCO acted under the express terms of the Premium Finance Agreement and refunded any excess funds that it received from Juice Stop Franchising via a check dated July 1, 1999. (AICCO's Br. in Supp. of Mot. for Summ. J. on Coverage Issues, Exh. 1, 2). The check was mailed to Juice Stop Franchising's address in Colorado and negotiated later that year. (*Id.*). Hence, AICCO did not retain any benefit at Juice Stop Franchising or Plaintiff–Trustee's expense. Thus, Plaintiff–Trustee's unjust enrichment claim fails.

Plaintiff–Trustee complains that he never received or cashed the check and that it should have been sent to him. At the

hearing, Plaintiff–Trustee stated that he believed the proceeds of the check may have been sold to another company, the Juice Kitchen, as an accounts receivable. However, whatever ultimately happened to the money is inconsequential for purposes of this litigation because it is clear that AICCO mailed the check to Juice Stop Franchising and the check was later negotiated. AICCO cannot be faulted for complying with its obligations under the Premium Finance Agreement and the evidence demonstrates that it did not retain any benefit at Plaintiff–Trustee's expense.

Plaintiff–Trustee also asserts claims of negligence, misrepresentation, and promissory estoppel against AICCO. (Second Am. Compl., at ¶¶ 81–94). Plaintiff–Trustee alleges that AICCO breached its "duty of care in providing information to Zurich ... concerning the reinstatement of insurance coverage and the payment of the premium by the insured." (*Id.* at ¶ 84). As explained above, this claim fails because AICCO specifically, conspicuously, and in plain language informed Juice Stop Franchising that the D & O Liability Policy was cancelled and was not in force until the insurance company advised it to the contrary. (*See* Pl.-Trustee's Br. in Supp. of Mot. for Summ. J., Exh. 21). That Juice Stop Franchising did not read the Request for Reinstatement or contact Zurich when it was never "advised promptly" that the D & O Liability Policy was not reinstated does not make AICCO negligent. (*Id.*).

Likewise, Plaintiff–Trustee's claim that AICCO continued to represent to Juice Stop Franchising that the D & O Liability Policy was in full force and effect is meritless. (Second Am. Compl., at ¶ 89). The Notice of Insured's Request for reinstatement stated the D & O Liability Policy was not "in force until the insurance company advises you to the contrary.... The fact that you continue to make payments to AICCO does not mean your insurance is in force." (Pl.-Trustee's Br. in Supp. of Mot. for Summ. J., Exh. 21) (emphasis omitted). After receiving this notice from AICCO, Juice Stop Franchising had a duty to contact Zurich and determine the status of its insurance coverage. That Juice Stop Franchising did nothing or did not read the notice does not make every conversation it had with AICCO thereafter a misrepresentation.

For all the aforementioned reasons, Defendant AICCO's Motion for Summary Judgment is **GRANTED**. Plaintiff–Trustee's Seventh, Eighth, and Ninth Claims for Relief against AICCO are **DISMISSED**.

### B. Defendant Crump's Motion for Summary Judgment.

Plaintiff–Trustee argues that Crump was negligent when it failed to procure the 1998–1999 D & O Liability Policy for Juice Stop International instead of Juice Stop Franchising. (Pl.-Trustee's Resp. to Defendant Crump's Mot. for Summ. J., at p. 5). According to Plaintiff–Trustee, Crump had an obligation to obtain a written insurance policy pursuant to the application, which identified Juice Stop International as the "parent company." (*Id.* at pp. 9–10). Plaintiff–Trustee also asserts that Crump is vicariously liable under the D & O Liability Policy because it was an agent of Zurich and acted with apparent authority on behalf of Zurich. (*Id.* at pp. 7–9).[12]

However, Plaintiff–Trustee's claims against Crump are moot because of the Court's finding that even if the D & O Liability Policy was issued to Juice Stop International, the Personal Profit exclusion

---

**12.** Plaintiff–Trustee has also alleged an unjust enrichment claim against Crump. This claim fails because Plaintiff–Trustee has presented no evidence that Crump received a benefit under circumstances that would make it unjust for it to retain without paying.

under the policy precluded coverage. Accordingly, Crump's Motion for Summary Judgment is **GRANTED** and Plaintiff's Seventh and Ninth Claims for Relief against Crump are **DISMISSED AS MOOT.**

C. Defendant Aylor's Motion for Summary Judgment.

The Court's finding that there was no coverage under the Personal Profit exclusion in the D & O Liability renders the Plaintiff–Trustee's negligence claims against Aylor moot. Plaintiff–Trustee has not presented any evidence of negligent or intentional misrepresentation by Aylor or that Aylor was unjustly enriched in some manner. Accordingly, Aylor's Motion for Summary Judgment is **GRANTED** and Plaintiff–Trustee's Seventh, Eighth, and Ninth Claims for Relief against Aylor are DISMISSED.

V. *Zurich's Cross–Claims Against Aylor and AICCO.*

The Court's disposition of the foregoing claims renders Zurich's cross-claims for negligence and contribution against Aylor and AICCO moot. (*See* Zurich's Answer and Defenses to Pls.' Second Am. Compl. and Cross–Claims, at pp. 16–23). Therefore, Zurich's First, Second, Third, and Fourth Cross–Claims for Relief are **DISMISSED AS MOOT.**

### *Conclusion*

Unfortunately, this case epitomizes the effects of corporate mismanagement and lends credence to the increasingly prevalent animadversion of corporate America. Several creditors will go unpaid and even more investors will lose faith in the market system. However, holding these Defendants liable on express contracts where clearly no liability exists to help spread the loss would be the antithesis of a just result and call into question the certitude of plain and unambiguous contracts.

For all the aforementioned reasons, Defendant Zurich American Insurance Group's, Aylor Insurance Agency, Inc.'s, A.I. Credit Corp.'s, and Crump E & S of California Insurance Services, Inc.'s Motions for Summary Judgment are **GRANTED.** Plaintiff–Trustee's Motion for Leave to File Third Amended Complaint is **DENIED.** Plaintiff–Trustee's Second Amended Complaint is **DISMISSED WITH PREJUDICE** in its entirety. Zurich American Insurance Group's Cross–Claims are **DISMISSED AS MOOT.**